Commonwealth *v.* Evans et al., Appellants.

180.

181

184

186

190

Argued December 11, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*H. G. Stutzman,* with him *David S. Kohn, Stutzman, Lewis and Sidoriak,* and *Kohn, Adler and Schatt,* for appellant.

*James H. Stewart, Jr.,* with him *Ernest S. Burch,* and *Nauman, Smith, Shissler & Hall,* for appellant.

*David J. Conroy,* for appellant.

*Earl V. Compton,* with him *Frederick G. McGavin,* for appellant.

*Carl B. Shelley,* with him *Shelley, Reynolds and Lipsitt,* for appellant.

*Huette F. Dowling,* District Attorney, and *Thomas D. McBride,* Attorney General, with them *Mary E. Hoerner,* Assistant District Attorney, *Alfred P. Filippone* and *Isaiah W. Crippins,* Deputy Attorneys General, and *Vincent G. Panati,* Special Assistant Attorney General, for Commonwealth, appellee.

OPINION BY RHODES, P. J., August 10, 1959:

These appeals are by five defendants, Thomas J. Evans, James F. Torrance, Charles W. Stickler, Clayton A. Landsidle, and Paul J. McNeill from judgments of sentence of the Court of Quarter Sessions of Dauphin County. Defendants were convicted of conspiracy to cheat and defraud the Pennsylvania Turnpike Commission in connection with certain transactions involving the Manu-Mine Research and Development Company during construction of the Northeastern Extension of the Pennsylvania Turnpike.[1] In addition, Thomas J. Evans, the former chairman of the commission, and James F. Torrance, a former member and secretary-treasurer of the commission, were convicted on separate indictments charging misbehavior in office. Charles W. Stickler, president of Manu-Mine and a principal stockholder, and Clayton A. Landsidle, general manager of Manu-Mine, were also convicted on an indictment charging the crime of cheating by fraudulent pretense, the Pennsylvania Turnpike Commission having been allegedly cheated and defrauded. Paul J. McNeill, former finance director of the commission, was named only in the conspiracy indictment.[2]

---

[1] Four other defendants who were likewise indicted in the Court of Quarter Sessions of Dauphin County for conspiracy to cheat and defraud the Pennsylvania Turnpike Commission were acquitted.

[2] The five defendants were sentenced as follows:

Thomas J. Evans. (1) Conspiracy (No. 216, January Sessions, 1957)—To pay a fine of $500, and to imprisonment for a definite or fixed term of two years; (2) Misbehavior in office (No. 221, January Sessions, 1957)—Count 1. To imprisonment for an indefinite term of not less than one year nor more than two years, to commence at the expiration of the sentence at No. 216, January Sessions, 1957; Count 2. To pay a fine of $5,000, and to imprisonment for an indefinite term of not less than one year nor more than two years, to commence at the expiration of the sentence at No. 216, January Sessions, 1957.

The issues presented on these appeals involve the refusal of defendants' motions to quash the indict-

James F. Torrance. (1) Conspiracy (No. 216, January Sessions, 1957)—To pay a fine of $500, and to imprisonment for an indefinite term of not less than one year nor more than two years; (2) Misbehavior in office (No. 220, January Sessions, 1957)—Count 1. To imprisonment for an indefinite term of not less than one year nor more than two years, to commence at the expiration of the sentence at No. 216, January Sessions, 1957; Count 2. To pay a fine of $1,000, and to imprisonment for an indefinite term of not less than one year nor more than two years, to commence at the expiration of the sentence at No. 216, January Sessions, 1957; Count 3. Sentence suspended.

Charles W. Stickler. (1) Conspiracy (No. 216, January Sessions, 1957)—To pay a fine of $500, and to imprisonment for a definite or fixed term of two years; (2) Fraudulent Pretense (No. 218, January Sessions, 1957)—Count 1. To imprisonment for a definite or fixed term of five years, to run concurrently with the sentence at No. 216, January Sessions, 1957; Counts 2 to 17, inclusive. To make restitution, and to imprisonment on each count for a definite or fixed term of five years, to run concurrently with the sentence at No. 216, January Sessions, 1957; in addition, on Count 11, to pay a fine of $5,000; Counts 18 to 21, inclusive. To imprisonment on each count for a definite or fixed term of five years, to run concurrently with the sentence at No. 216, January Sessions, 1957. Count 22. Sentence suspended.

Clayton A. Landsidle. (1) Conspiracy (No. 216, January Sessions, 1957)—To pay a fine of $500, and to imprisonment for an indefinite term of not less than ten months nor more than twenty-three months; (2) Fraudulent Pretense (No. 218, January Sessions, 1957)—Count 1. To imprisonment for an indefinite term of not less than one year nor more than two years, to commence at the expiration of the sentence at No. 216, January Sessions, 1957; Counts 2 to 17, inclusive. To make restitution, and to imprisonment on each count for an indefinite term of not less than one year nor more than two years, to commence at the expiration of the sentence at No. 216, January Sessions, 1957; in addition, on Count 11, to pay a fine of $1,000; Counts 18 to 21, inclusive. To imprisonment on each count for an indefinite term of not less than one year nor more than two years, to commence at the expiration of the sentence at No. 216, January Sessions, 1957.

ments, the refusal of defendants' motions in arrest of judgment, and the refusal of defendants' motions for a new trial.

The crimes for which these defendants were convicted arose principally out of a contract dated February 28, 1955, between the commission and Manu-Mine. The ostensible purpose of the contract was to provide surface support for the right of way of the Northeastern Extension across the anthracite coal measures by means of a program of slushing material into mine voids underlying the road way area. Under the contract, Manu-Mine was engaged (1) to plan and design the slushing operation, for which it was to be paid a maximum of $9,600; (2) to supervise and inspect the slushing work, for which it was to be paid either $138 or $207 per eight-hour shift, depending upon underground conditions; and (3) to drill and case holes through which the material was to be slushed underground, for which it was to be paid $12.50 per foot of hole drilled. Manu-Mine performed work under the contract until it was suspended on February 27, 1956, prior to full completion. No voucher for the $9,600 for design work was submitted during the active performance of the contract. But for work up to December 31, 1955, payments had been made to Manu-Mine totaling $6,846,441.64, of which $6,724,718.74 was for drilling, and $121,722.90 was for inspection and supervision. Periodical estimates for additional work to February 29, 1956, were submitted in the amount of approximately $833,000, but they were not paid. Of the total amount of $7,679,441.64 "earned" by Manu-

Paul J. McNeill. Conspiracy (No. 216, January Sessions, 1957)— To pay a fine of $500, and to imprisonment for an indefinite term of not less than ten months nor more than twenty-three months.

Each sentence directed payment of the costs of prosecution, and imprisonment in the Dauphin County Prison.

Mine under the contract, the profit, after all expenses, amounted to approximately $4,000,000, or more than 100 per cent of the cost. Manu-Mine was owned by defendant Stickler, Stickler's wife, and the late Richard Evans. Stickler was a nephew of the wife of defendant Evans, and Richard Evans was his son.

In brief, it was the theory of the Commonwealth that the defendants had conspired to defraud the commission by obtaining this contract and payments thereunder for Manu-Mine; that the drilling and slushing program, inaugurated at the request and on the recommendation of Manu-Mine, was in fact 95 per cent unnecessary; and that the price for drilling was unconscionably excessive and fraudulent, especially since Manu-Mine had represented that the contract cost per foot of drilling had been computed on the basis of the cost plus only 10 per cent profit.

I. The Validity of the Indictments

On October 22, 1956, upon the petition of the Attorney General of the Commonwealth, dated September 1, 1956, in which the District Attorney of Dauphin County had joined, a special investigating grand jury was convened. The matters disclosed by the presentment of the investigating grand jury formed the basis for the bills of indictment submitted, at the direction of the court, to the regular grand jury for the January Sessions of 1957. On January 23, 1957, the regular grand jury returned indictments against the nine defendants, five of whom have appealed after conviction, and four of whom were acquitted. Defendants moved to quash the indictments, alleging that on the evening that the investigating grand jury convened and on the following evening the Governor of the Commonwealth, in broadcasts over two Harrisburg television stations, made an inflammatory speech and remarks, and that the district attorney and the special deputy attorney

general had intruded upon the deliberations of the investigating grand jury, which was prejudicial to defendants. The motions to quash were denied in an opinion by Judge NEELY; we believe this was proper.

It is significant that the motions to quash, with the exception of that filed by defendant Torrance, do not question the form or sufficiency of the indictments, and that the matters alleged as prejudicial are extraneous to the indictments and relate principally to the investigating grand jury and not to the indicting grand jury. Ordinarily, alleged defects or irregularities in the proceedings preliminary or antecedent to the indictment may not be considered on a motion to quash. *Com. v. Gross*, 172 Pa. Superior Ct. 85, 92, 92 A. 2d 251. A motion to quash which is based upon the allegation of extraneous factors should not be sustained unless it clearly appears that the defendant has been harmed by some improper conduct that interfered with his substantial rights. The court below concluded that the remarks of the Governor at the time the investigating grand jury convened were not such as to harm the defendants in the subsequent return of the indictments. In this respect the court considered not only the allegations of defendants, but also the fact that the investigating grand jury was specifically admonished in the charge of the court to divorce its deliberations from any political turmoil, public clamor, or publicity, and to reach its conclusions on the basis of the evidence presented "uninfluenced by any partisanship or political considerations whatsoever." There is nothing to indicate that the investigating grand jury did not properly follow this instruction. *Com v. Brownmiller*, 141 Pa. Superior Ct. 107, 113, 14 A. 2d 907. Nor is there any indication that the grand jurors heard such irrelevant remarks. If they had it would not necessarily invalidate the subsequent indictments based upon

other and proper evidence. *Com. v. Gross,* supra, 172 Pa. Superior Ct. 85, 92, 92 A. 2d 251.

The allegation of intrusion by the district attorney and the special deputy attorney general is likewise extraneous to the indictments and is without merit.

"It is the duty of the district attorney . . . to attend upon a grand jury, lay before them all matters upon which they are to pass, aid them in the examination of witnesses and give general instructions as may be required. It is highly improper, however, for the district attorney . . . to take part in the deliberations of a grand jury, as it is their duty to consider alone the evidence and apply it to the case." *Com. v. Brownmiller,* supra, 141 Pa. Superior Ct. 107, 113, 14 A. 2d 907, 910. The record shows that the district attorney and the deputy attorney general properly attended upon the investigating grand jury giving only general advice. There was no improper conduct or intrusion upon its deliberations.

A further consideration is that the investigating grand jury and the indicting grand jury are separate legal bodies. Although both may have considered the same alleged crimes involving the same individuals, their proceedings, deliberations, and presentments are distinct. Extraneous matters affecting one may not influence the other, and irregularities before one are not always present in the other; the two bodies are unrelated in this respect. Consequently, an indictment by a regular grand jury is not necessarily tainted by some irregularity or improper influence alleged to have affected the investigating grand jury. *Com. v. Gross,* supra, 172 Pa. Superior Ct. 85, 90, 91, 92 A. 2d 251. At least, the irregularity or improper influence must be shown to have also affected the indicting grand jury. Nothing of this nature appears in this case. "No matter how irregular the investigatory proceedings be-

fore the grand jury may have been, the presentment at least furnished the district attorney with information sufficient to justify his application for leave to present a district attorney's bill." *Com. v. Brownmiller,* 137 Pa. Superior Ct. 261, 267, 9 A. 2d 155, 158.

In his appeal Torrance raises two additional matters with respect to the indictments, one possibly affecting their form and the other attacking their sufficiency. It is argued that the court failed to approve the indictments presented to the regular grand jury. On January 21, 1957, the court entered an order that the district attorney "prepare and submit to the regular January, 1957, Grand Jury now in sessions, bills of indictment covering all the matters contained in the Presentment of the Special Grand Jury of Investigation made to the Court on Friday, January 18, 1957." Apparently no subsequent order formally approving the indictments drawn pursuant to this order was entered.

Generally, an indictment may come before a grand jury only if it is founded upon the transcript of a magistrate or an order of court evidencing leave to present it. *Com. v. Wilson,* 134 Pa. Superior Ct. 222, 227, 4 A. 2d 324; *Com. v. Russo,* 177 Pa. Superior Ct. 470, 477, 111 A. 2d 359. A district attorney's bill would appear to be a substitute for the preliminary proceedings normally held in criminal matters. As such it should be subject to the general rule previously stated that alleged defects or irregularities in the proceedings preliminary or antecedent to indictment may not be examined on a motion to quash. *Com. v. Gross,* supra, 172 Pa. Superior Ct. 85, 92, 92 A. 2d 251. Nevertheless, we are of the opinion that the order of January 21, 1957, was sufficient leave of court for submission of the indictments. The order directed not only the preparation of indictments covering the matters presented by the investigating grand jury, but the submis-

sion of those indictments to the regular grand jury as well. In both respects the district attorney acted in conformity with the court's order.

It has also been argued before us on behalf of Torrance that the indictments are insufficient as a matter of law. At No. 216, January Sessions, 1957, Torrance and the other defendants were indicted for conspiracy to defraud and to do other unlawful acts to the prejudice of the commission in connection with the Manu-Mine contract of February 28, 1955. At No. 220, January Sessions, 1957, Torrance was indicted on three counts—the first charging misbehavior in office by corruptly participating in the negotiation and obtaining of the Manu-Mine contract; the second charging misbehavior in office by willfully and corruptly permitting the Manu-Mine contract to become effective thereafter and by permitting payment of vast sums of money to Manu-Mine pursuant to said contract; and the third charging that he, being a turnpike commissioner, hampered, obstructed, and corruptly interfered with the proper investigation of the Manu-Mine contract. Torrance claims that the conspiracy indictment and counts 1 and 2 of the misbehavior indictment contain erroneous statements of the law relative to contracts entered into by the commission in that the practice of competitive bidding, the requirement of performance bonds, and similar contractual provisions are referred to as "legal" requirements which were not complied with in the negotiation and execution of the Manu-Mine contract. We have examined the indictments thoroughly and conclude that, even assuming that the practice of competitive bidding and the inclusion of the customary provisions of a construction contract are not legal requirements, the indictments are nevertheless sufficient. The statements in the indictments to the effect that these requirements are "legal" requirements, if erroneous, would be surplusage; the

validity of the indictments is not affected by the elimination of the words "legal" or "legally." *Com. v. Bristow*, 185 Pa. Superior Ct. 448, 459, 138 A. 2d 156; *Com. v. Havrilla*, 38 Pa. Superior Ct. 292, 297. Eliminating the words "legal" or "legally," the indictments still charge that, in negotiating and obtaining the Manu-Mine contract, the defendants did not comply with the usual practice of the commission regarding competitive bidding or include other contractual provisions normal to construction contracts, and that the failure to follow these normal procedures was one of the methods by which the fraud was perpetrated, the contract obtained, and the moneys paid, to the prejudice of the commission. Whether or not these procedures are legal requirements, and the significance of the failure of defendants to comply therewith will be the subject of further discussion in this opinion.

The motions to quash the indictments were properly denied.

## II. The Sufficiency of the Evidence

Probably the most important issue before us is the sufficiency of the evidence to support the jury's verdicts that the defendants were guilty of the crimes charged in the indictments.

We turn to a consideration of the motions in arrest of judgment and the sufficiency of the evidence to sustain the convictions. The evidence was largely circumstantial especially as it related to the conspiracy. The burden was upon the Commonwealth to overcome the presumption of innocence and to establish beyond a reasonable doubt the crimes charged. That the evidence was wholly or largely circumstantial is not fatal if it appears that the evidence is such as reasonably and naturally justifies an inference of guilt of the accused and is of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt. *Com.*

*v. Bausewine,* 354 Pa. 35, 40, 46 A. 2d 491; *Com. v. Nasuti,* 385 Pa. 436, 445, 123 A. 2d 435; *Com. v. Clinton,* 391 Pa. 212, 218, 137 A. 2d 463; *Com. v. Ott,* 154 Pa. Superior Ct. 647, 652, 36 A. 2d 838. A conviction will not be allowed to stand if it is based solely upon suspicions and conjectures. *Com. v. Clinton,* supra, 391 Pa. 212, 218, 137 A. 2d 463. "Where conviction must be based on circumstantial evidence, as it must here, the theme of guilt must flow from the facts and circumstances proved, and be consistent with them all." *Com. v. Clinton,* supra, 391 Pa. 212, 218, 137 A. 2d 463, 466. The Commonwealth, however, is " '. . . not required to present direct and positive testimony of a collusive agreement to do something unlawful. The nature of the crime attempted usually makes it susceptible of no other proof than by circumstantial evidence . . .' " *Com. v. Musser Forests, Inc.,* 394 Pa. 205, 211, 146 A. 2d 714, 717.

In a conspiracy trial, where fraud is involved, there is a wide latitude allowed in the introduction of evidence. Consideration should be given to the background of the arrangements made by defendants and their methods of association; where a criminal scheme has numerous actors and shifting scenes of action the conspiracy is often made out by the association of detached facts and by the reasonable inferences deducible therefrom. Evidence of the acts and circumstances in fulfillment of the object of the conspiracy is relevant. *Com. v. Berman,* 119 Pa. Superior Ct. 315, 326, 181 A. 244; *Com. v. Sanderson,* 40 Pa. Superior Ct. 416, 472, 473; *Com. v. Bartell,* 184 Pa. Superior Ct. 528, 548, 136 A. 2d 166; *Walter J. Scanlan & Son v. Sherbine,* 382 Pa. 376, 379, 114 A. 2d 900. Moreover, "the actions of the conspirators will be sufficient evidence to prove that a conspiracy exists." *Com. v. Musser Forests, Inc.,* supra, 394 Pa. 205, 210, 146 A. 2d 714, 716.

With these principles in mind we shall consider the evidence. The Manu-Mine Research and Development Company was incorporated in March, 1951. The incorporators included Stickler, Richard Evans, and several other individuals. In its first year of business Manu-Mine sold paint and preservatives and suffered a loss in all its operations of approximately $300. During this year it had received nominal orders for paints or sealing compounds from the commission. From this time on Manu-Mine experienced progressively greater financial success almost exclusively as a result of business with the commission.[3] By October 31, 1953, Manu-Mine had a total gross business since its inception of $460,000 of which $426,000 was received from the commission. By this date only Stickler and Richard Evans of the original incorporators remained. The favorable relationship between Manu-Mine and the commission became evident about this time. Jerome LaManna who was the accountant for Manu-Mine inquired of Stickler how Manu-Mine obtained work from the commission without bids, and Stickler informed him that the business was not contract work but a purchase order. It is noted in this regard that Richard Evans, vice president and stockholder of Manu-Mine, had no desk at its office and apparently participated in the running of the business only to the extent of attending board meetings and advising Stickler on insurance mat-

---

[3] In 1952, Manu-Mine did a total business of $116,000 of which $112,000 was for soil solidification work done on tunnels of the original turnpike. The commission provided approximately 95 per cent of Manu-Mine's business for that year. The soil solidification work was actually performed by a sub-contractor, The Chemical Soil and Solidification Company of Chicago, at a total cost of about $62,000. Manu-Mine had a gross profit on this job of $50,000. In the following year, 1953, Manu-Mine did a total business of $310,000, 94 per cent of which represented income from the Turnpike Commission for soil solidification work, for a survey, and for sales of materials.

ters. Nevertheless, he received a salary and bonus commensurate with full time executive employment.

In the year 1954 total sales of Manu-Mine were $815,000 of which $757,000 or 90 per cent was received from the Turnpike Commission. The stockholders at this time, and thereafter, were Stickler, who owned over 50 per cent, Mrs. Stickler, and Richard Evans. For the year 1955 the total amount of business transacted by Manu-Mine was $5,200,000 of which $4,800,000 or 90 per cent was received from the commission. By October 31, 1955, the stock of Manu-Mine, which had a value of $100 in 1951, had a value of $42,600 per share. For the year 1956, the year in which Manu-Mine was suspended from the February 28th contract Manu-Mine did a total business of $4,500,000 of which $2,800,000 or 63 per cent came from the commission.

In October, 1953, the commission gave a contract to Manu-Mine to study the mining conditions underlying each of four proposed alternate right of way lines for construction of the Northeastern Extension as it crossed the anthracite coal measures and to make recommendations as to the best line to follow. In February, 1954, the commission employed Manu-Mine to furnish an estimate of the value of coal under the proposed route of the Northeastern Extension. On July 7, 1954, the commission entered into a contract with Manu-Mine to patrol the line of the proposed turnpike in the anthracite area and to obtain and furnish aerial photographs of the right of way. On the same date the commission engaged Manu-Mine to do exploratory drilling, research, and engineering work in the anthracite area for the purpose of ascertaining the underground conditions and recommending corrective action.[4]

---

[4] This contract was to run for a period of three months for which Manu-Mine was to be paid $19,250 per month plus an amount

While the engineering services and work under the contract of July 7, 1954, were being performed by Manu-Mine, the contract which formed the essential basis for these indictments came into being. On February 28, 1955, a contract was given to Manu-Mine without competitive bidding to lay out and design a slushing program to provide surface support for the turnpike as it crossed the anthracite measures, to drill holes into the underground voids at a price of $12.50 per foot through which material was to be slushed underground, and to supervise the operations of the contractors who were engaged by the commission to supply the material and slush it into the underground voids through the holes drilled by Manu-Mine. The negotiation of this contract had its inception at the instance of Manu-Mine. It appears that in December, 1954, Stickler, Landsidle, and Harry Luke, project engineer of Manu-Mine, gave consideration to proposing to the commission that Manu-Mine do the drilling for the slushing program. Stickler and Landsidle decided they could do the drilling work, and they prepared a draft of the contract to submit to the commission. Landsidle and Luke met with John D. Paul, assistant chief engineer of the commission, on December 30, 1954, at which time they discussed the proposed contract and Paul requested that estimates of the cost of the work be furnished. Early in January, 1955, a meeting was held at the Hotel Sterling, in Wilkes-Barre, attended by Evans, Torrance, Stickler, John D. Paul,

---

for drilling exploratory boreholes which was to be later agreed upon. The contract was extended twice for periods of three months on each occasion; a third extension was granted April 7, 1955, for a period of six months at a reduced fee of $16,500 per month. Altogether Manu-Mine was paid $272,000 for the engineering and $104,000 for the drilling or a total of $376,000 under this contract of July 7, 1954.

and others for the purpose of examining the right of way line of the turnpike and to make some determination with respect to crossing the coal measures. Arthur B. Cleaves, a geologist who was at that time employed by the commission on a part time basis and also by Manu-Mine, testified that at this meeting Evans berated him because a local newspaper had carried a story to the effect that Manu-Mine was going to receive a contract from the commission in connection with the slushing program. The commission, and in particular Evans, was upset by the premature publicity; Evans told Cleaves, "What is the matter with you? I thought you were supposed to see that Manu-Mine didn't get into any problems like this." This unwanted publicity resulted when Luke told a newspaper reporter about January 4, 1955, that Manu-Mine would receive a contract from the commission for this slushing program. Luke furnished the newspaper with certain details of the transaction, such as the fact that the work had to be completed by 1956.

On January 6, 1955, Landsidle submitted to the commission a draft of the contract for services and work in the slushing program, a cost analysis of the various items under the contract, including the $12.50 per foot drilling price, and estimates of the cost of drilling and slushing across the anthracite measures. On January 13, 1955, Landsidle and Luke met with John D. Paul and discussed the time necessary to complete the slushing program. Paul informed them that their proposed drilling program would take two years and that this was unsatisfactory since construction had to be completed by February, 1956. Landsidle knew then that the proposed drilling program was inadequate.

Thereafter, on February 14, 1955, Manu-Mine submitted supplements to the initial draft of the contract.

The preliminary copy of the contract submitted by Manu-Mine was drafted into final form at the commission, with certain minor changes and the supplements, and was approved by the commission at its meeting on February 28, 1955. After its approval the contract was executed by Evans, Torrance, Theodore S. Paul, the commission counsel, Stickler and Landsidle.

The circumstances of the adoption of the Manu-Mine contract at the February 28, 1955, meeting of the Turnpike Commission were testified to by Joseph J. Lawler, the then recently appointed Secretary of Highways and ex officio member of the commission. This was apparently the second meeting of the commission that Lawler attended. Prior to the meeting on February 28th, Lawler had not heard of Manu-Mine, did not have knowledge of the work to be performed under this contract, and did not know who the officials of Manu-Mine were or their relationship with Evans. The general provisions of the contract, which was designated as a contract for engineering services, were outlined at the meeting by John D. Paul. In the course of the discussion it was stressed to Lawler that it was important that the contract be approved expeditiously to meet the completion of construction of the Northeastern Extension because of the interest payments to be made on the bonds which had been sold for its construction. Evans and Torrance indicated that it was in the best interest of the commission that the contract be approved and pointed out to Lawler that Manu-Mine had an international reputation, that it was an outstanding firm, and that it was the only firm in existence that was qualified to do that type of work. Lawler stated that he did not question the contract because he respected the other members of the commission since they had experience at the commission and had previously done business with Manu-Mine. The contract was approved by the vote of all of the commissioners,

that is, Evans, Torrance, McSorley, Watson, and Lawler.

Subsequently, Manu-Mine began work under the contract, and in May, 1955, submitted its first periodical estimate for payment. It continued to perform work until its suspension, after an investigation, on February 27, 1956. For the work performed Manu-Mine submitted periodical estimates for payment in the total amount of $7,679,441.64, of which $6,846,441.64 was paid. Of the amount paid $6,724,718.74 was for drilling at $12.50 per foot.

Under the Act of 1937 which created the Pennsylvania Turnpike Commission and made it an instrumentality of the Commonwealth, and the Act of 1951 which authorized the Northeastern Extension to the Pennsylvania Turnpike, the commission is given the power to contract, provided, however, that contracts relating to construction are required to be approved by the Department of Highways and such construction must be performed under the supervision of that department.[5] For the purpose of scrutinizing construction contracts which required approval of the Department of Highways and for the giving of such approval the Department of Highways maintained at the commission a liaison officer. The department kept a file in its own office of commission contracts which it approved. Before giving his approval, the Department of Highways' liaison officer would check the contracts, the quantities, unit prices and similar matters. If the contracts were found to be satisfactory it was his practice as a rule to approve for the Department of Highways the construction contracts entered into by the commission. The liaison officer, Henry Kloss, a registered professional engineer, in March or April,

---

[5] Section 4, Act of May 21, 1937, P. L. 211, 36 PS §652d; section 6 of the Act of September 27, 1951, P. L. 1430, 36 PS §660.6.

1955, inspected the drilling being done by Manu-Mine on the Northeastern Extension. When he learned that the drilling was not exploratory drilling, that is test drilling, but was drilling for purposes of slushing or flushing, he questioned John D. Paul, the commission engineer, concerning the contract under which the drilling was done. He was informed by Paul that the contract was not necessarily construction but that it was part of an engineering proposition. The Manu-Mine contract was never submitted to Kloss for approval; it was not approved by the Department of Highways and was not on file at the department.

The commission as a general rule uses a standard form of construction contract. The Manu-Mine contract, however, was in the special form of engineering contracts. Engineering contracts as distinguished from construction contracts are not required by law to have the approval of the Department of Highways.

The use of an engineering form for this contract is significant in other respects. It was the general procedure at the commission, notwithstanding the fact that there is no such legal requirement in the statute, that contracts for construction, as distinguished from engineering contracts, be let after bids are obtained. The general practice was that specifications would first be drawn up and advertisements for bids be placed. The contract was then awarded to the properly qualified low bidder. This practice was varied in some instances in that some construction contracts as well as engineering and other contracts were negotiated. It is significant that the Manu-Mine contract negotiations were instituted by Manu-Mine without prior specifications having been prepared by the commission.

It was also the practice at the commission that the contractor be required to provide a performance bond

and a labor and materialmen's bond, and that the contract contain a provision for the retention of 10 per cent of the periodical payments made during the course of the performance of the contract in order to assure the commission that the work would ultimately be performed and the materials supplied. None of these requirements or provisions were contained in the Manu-Mine contract. Of the forty-one roadway and tunnel construction contracts let on the Northeastern Extension, exclusive of the Manu-Mine contract, all but one were competitively bid, were drawn to the standard form of construction contracts used at the commission, and had the usual protective provisions. Contracts for the construction of the interchange buildings, for some of the bridges, for roadway lighting, and for maintenance buildings were submitted for bids. Contracts for the supplying of materials were generally not bid because they did not relate to roadway construction as such. And many of the contracts relating to the supplying of equipment and materials that were not competitively bid nevertheless contained the protective requirements of a performance bond, a labor and materialmen's bond, and a retention clause. It is clear beyond reasonable doubt that the Manu-Mine contract was disguised as an engineering contract to avoid competitive bidding and the scrutiny of the Department of Highways which would have been required in the normal course of events had it been designated and treated as the construction contract that it was. That it was in reality a construction contract except for some minor detail is clear from the evidence. The Commonwealth called a number of expert witnesses of considerable experience in mining and construction engineering in general who testified that the drilling of holes for slushing, constituting the major portion of this contract and for which all but a small amount of the funds paid to Manu-Mine was attributable, was

construction work.[6]  The subsequent handling of the Manu-Mine contract by defendants and the commission corroborated the Commonwealth witnesses.  Although the contract had been treated as one relating to engineering services in the negotiations and at its adoption by the commission, it was considered construction in its performance and in the payments made to Manu-Mine for the work done thereunder.  The amounts paid to Manu-Mine were drawn from the construction fund, not from the engineering fund.  The periodical estimates for payment submitted by Manu-Mine were submitted on the regular contract form of the commission for construction work and Manu-Mine was referred to therein as the "contractor."  The certificate on each of the periodical estimates signed by Landsidle as general manager of Manu-Mine states that the work has been performed in accordance with the "terms and conditions of the corresponding construction contract documents."  The contract later received a number in the sequence of construction contracts, and the standard construction performance bond and a labor and materialmen's bond were requested and related back to the time of the contract.

This initial disguise was employed to perpetrate and conceal the fraud of obvious magnitude.  When the Northeastern Extension to the Pennsylvania Turnpike

---

[6] The experts so testifying were: Daniel H. Connelly, Deputy Secretary of Mines and Mineral Industries, who made a study of the turnpike as it crossed the anthracite measures; Thomas M. Beany, a State mine inspector of twelve years' experience, and thirty-nine years' continuous employment in the anthracite field; Ralph Lambert, chief mining engineer for the Department of Mines and Mineral Industries, a registered mining engineer, who participated in the study made by Connelly and Beany; James H. Pierce, a mining engineer with considerable experience in mining, construction, and consulting engineering, who was engaged to investigate the Manu-Mine work.

was authorized by the Legislature it became necessary that an engineering report be prepared with estimates of the probable cost of construction in order that bonds could be sold to raise funds for construction. The J. E. Greiner Company, the consulting engineer to the commission, prepared a report which it submitted to the commission with a covering letter of March 22, 1954. The total initial construction cost of the Northeastern Extension estimated in the budget was $149,000,000, to which was added a contingency fund in the amount of $19,000,000. The preliminary budget for construction of the Northeastern Extension had nothing by way of allocation of funds for drilling and slushing work. The Greiner report stated only that the anthracite measures required some special consideration since the sub-surface conditions were indeterminate and there remained a propensity for future subsidence. The covering letter, however, stated that the problems that might be encountered in the anthracite measures would require some special investigation and study but that they were not expected to exceed those comparable in character and magnitude heretofore successfully solved on existing portions of the turnpike. The cost of slushing mined areas was recognized only to the extent that it was a possible contingency, but there was no estimate of that cost provided. It also appears that in addition to the $19,000,000 contingency fund there was, by October, 1954, an indicated surplus in construction costs of $13,000,000 due to the fact that certain types of excavation contracts were actually bid at a lower figure than was originally estimated.

The estimate of the total cost of the drilling and slushing submitted by Manu-Mine with its January 6, 1955, letter indicated a total cost of the program of approximately $4,120,000 of which approximately $3,380,000 was for drilling at the rate of $12.50 per foot. When Manu-Mine submitted its first periodical esti-

mate for payment the cost of drilling on two sections was estimated at $2,500,000. Thereafter the total cost of drilling appearing on the periodical estimates increased first to $6,600,000 and then by December, 1955, to $8,600,000. The total cost of drilling and slushing would have been over $13,500,000.

The cost per mile proposed and charged by Manu-Mine for support of the turnpike in this area was $3,-000,000 as compared to a cost per mile of approximately $1,000,000 for the actual roadway.

The fraud perpetrated by this slushing program was twofold. The slushing program was unnecessary to the extent of about 95 per cent and the price charged by Manu-Mine for drilling was grossly exorbitant. The expert witnesses called by the Commonwealth, who had considerable experience in mining and engineering in the anthracite area, testified that slushing is necessary to render surface support in a first mined area, that is, where pillars of coal are left by the mining operation. But in robbed out areas, that is, where the pillars are removed, the roof of the mine and the surface above it collapses, subsides, and reaches an equilibrium in approximately seven years when the ground comes to rest. The experts stated that the drilling of boreholes and slushing of silt into such areas would not give any additional support to the surface. They testified that the program of Manu-Mine calling for slushing and drilling of boreholes in those areas which had been subjected to second mining, which involved most of the anthracite measures included in the Manu-Mine program, was unnecessary.[7] Manu-Mine used a

[7] Daniel H. Connelly testified that seven or eight years after the mining of pillars takes place the possibility of subsidence is 99 per cent removed so that slushing into those voids would not lend any additional support to the surface. Thomas M. Beany, a State mine inspector, testified that all of the work done by Manu-Mine over robbed out areas was unnecessary because the voids had

system of controlled slushing in places where the underground voids were accessible, but the largest amount of drilling was done in areas which were not accessible; in such areas generally Manu-Mine drilled holes on a geometric pattern of five holes abreast every fifty feet along the turnpike right of way.[8] The drilling of holes in a geometric pattern resulted in most of the holes being driven into pillars of coal or otherwise not reaching voids. George D. Oswald, who was employed by the Sullivan Trail Coal Company and Rogers Construction Company in performing the actual slushing into the voids, testified that the holes drilled by Manu-Mine were collapsed or filled with dirt and rock and unable to take more than a token amount of slushing material. He estimated that approximately 60 per cent of the holes would not take the material or more than a negligible amount while the remaining 40 per cent took considerably less than the estimated amount because the holes were collapsed or blocked. Although the purported purpose of the contract was to drill holes into the voids which were to be filled with silt and thus prevent subsidence, the majority of the holes were use-

---

caved in and the overburden had come to rest. Ralph Lambert, chief mining engineer for the Department of Mines and Mineral Industries and a registered mining engineer in the anthracite fields, testified that where pillars were removed the strata had become stabilized and did not require drilling or flushing. Lambert testified that about 95 per cent of the holes drilled by Manu-Mine on two of the sections were not necessary. Franz Kudlich, a professional mining engineer, testified that in the robbed out areas or exhausted areas of coal mining there was either no possibility or a negligible possibility of further subsidence. Kudlich testified that only about 5 per cent of the drilling done by Manu-Mine was necessary.

[8] About 90 per cent of the underground area was inaccessible. Approximately 80 per cent of the drilling done by Manu-Mine was this blind drilling.

less, except to form the basis for the periodical esti-
mates submitted by Manu-Mine. Even the witness
Cleaves, who was called by defendants, testified that
the drilling of holes for blind flushing in a geometric
pattern on 50-foot centers was absurd. That the drill-
ing and slushing program was unnecessary to the ex-
tent that it was performed by Manu-Mine, or even a
substantial portion thereof, was clearly demonstrated
beyond reasonable doubt.

It thus appears that the drilling and slushing pro-
gram was unnecessary to the extent of about 95 per
cent of that performed by Manu-Mine, while the price
charged for drilling was grossly exorbitant.

The draft of the contract sent by Manu-Mine to the
commission proposed a price per foot of drilling of
$12.50. In justification thereof Manu-Mine submitted
a cost analysis showing that at a rate of drilling of
28 feet per day the price represented the cost for each
foot drilled plus a profit of 10 per cent. The price
charged was directly related to the number of feet that
could be drilled in each shift by the drill, which was
then designated as a Joy No. 32 air blast drill. Actu-
ally, in the major performance of this contract, Manu-
Mine used a much heavier drill, a B 58 drill, which was
common to the anthracite area, and which experienced
a production rate averaging 179 feet per shift. Some
apparently went as high as 448 feet per shift. Since
the price had been fixed on the basis of 28 feet per
shift per drill, the effect of increasing the production
to an average of 179 feet per shift was to tremendously
increase the income without a proportionate increase
in expenses, leaving a profit far in excess of the 10
per cent submitted in the cost analysis. Under the cost
analysis the profit per shift would have been about
$32, whereas under the actual performance the profit
reached $1,400. The Commonwealth's expert witnesses
testified that the cost per foot of drilling should have

been between $4.50 per foot and $5.95 per foot.[9] The Commonwealth's witnesses were corroborated by the fact that on March 21, 1955, less than a month after the contract with the commission, Manu-Mine bid $3.19 per foot on a drilling job in Carbondale for holes identical in size, to similar depths through the same type earth strata, through the same type of broken ground, and through multiple seams of coal. Manu-Mine lost the job because its bid was too high. The exorbitance of the price paid to Manu-Mine by the commission is clear beyond question. When the cost analysis was submitted, Stickler and Landsidle did not intend to use the Joy No. 32 drill, upon which they based the cost analysis, in the performance of this contract.[10] Landsidle testified that the entire drilling arrangement using the heavier B 58 drills was planned and known to Manu-Mine before the signing of the February 28, 1955, contract. Still the $12.50 price based on the false cost analysis was incorporated into the final contract and was the price paid for the drilling billed.

We are of the opinion that the evidence clearly and beyond a reasonable doubt demonstrates the conspiracy to defraud. The lack of direct evidence of any con-

---

[9] Daniel H. Connelly testified that the price per foot of drilling should have been $4.50; Franz Kudlich and James H. Pierce testified that the price should have been $5.95. The actual cost, including substantial bonuses and overhead, experienced by Manu-Mine on the job, plus a 10 per cent profit, amounted to $6.67 per foot.

[10] Landsidle testified that on January 6, 1955, when the cost analysis based on the Joy No. 32 drill was sent to the commission, Manu-Mine did not intend to perform the work with that drill. At a meeting on January 13, 1955, with John D. Paul, Landsidle was told that the proposed rate of drilling was unsatisfactory and would take, according to Paul's calculations, two years. Landsidle also stated that he knew that at the 28-foot per shift rate estimated in the cost analysis submitted on January 6, 1955, the job would have taken 20 years with one Joy No. 32 drill.

spiratorial meeting and agreement between the defendants to perpetrate this fraud has been more than adequately replaced by the wealth of circumstantial evidence which is of such volume and quality as to reasonably and naturally justify the inference of their guilt and to overcome the presumption of innocence. Except in two instances the evidence establishes their guilt on all charges.

While there is no direct evidence of an explicit or formal agreement to commit the fraud, such evidence is not essential, for proof of this criminal partnership is the obvious conclusion arising from the circumstances attending the activities of the defendants. *Com. v. Musser Forests, Inc.*, supra, 394 Pa. 205, 146 A. 2d 714. Viewed in its entirety the record demonstrates the subtle but effective manner in which Manu-Mine came to profit to such an extent by its favorable position with the commission. From its humble beginnings Manu-Mine rose with meteoric speed to a position of great financial success almost exclusively through the co-operative attitude of the commission.

In the initial stages of planning for the construction of the Northeastern Extension the problem of subsidence was not expected to be one of significant magnitude. But when Manu-Mine had entered the scene and began its initial exploratory work the problem of subsidence and what to do about it began to become a major problem. Without prior specifications drawn by the commission or its staff, Manu-Mine proposed the program which ultimately worked to its great profit. Its proposal and the contract it obtained as a result thereof were cleverly disguised as a rather innocuous appearing engineering contract, when in reality the essence of the contract was construction work. So certain was the fact that Manu-Mine would obtain this contract that it indulged itself an anticipatory

announcement in the newspaper article released prematurely by Luke, which so dismayed Evans. The contract was then expeditiously run through the formality of the February 28, 1955, meeting with the aid of Evans and Torrance accompanied by their assurances that the work was necessary and that Manu-Mine was the only firm to do it. Manu-Mine then began work under the contract. It used equipment which had a drilling rate far in excess of the 28 feet per day upon which its drilling price of $12.50 per foot was based. Even the Joy No. 32 drill mentioned in the cost analysis produced an average of 51 feet and a maximum of 78 feet per shift. Manu-Mine drilled holes which served no useful purpose other than to form the basis for periodical estimates for payment. The vast majority of the holes drilled were unnecessary, would not take material, and were of no benefit in the slushing program. For these as well as the few holes that had usefulness it charged the exorbitant price which had fraudulently been obtained and justified by the false cost analysis.

Evans, who had been a commissioner since May 17, 1939, is inextricably a principal in the conspiracy. The substantial success of Manu-Mine, which was owned largely by his son and the nephew of his wife, resulted solely from business given to it by the commission without competitive bidding. His introduction of the commission geologist Cleaves to Stickler, his permitting Cleaves to be employed by both the commission and Manu-Mine, his berating of Cleaves, and his evident disturbance because of the premature publicity given the Manu-Mine contract, his conduct at the February 28, 1955, meeting where together with Torrance he impressed upon Lawler the urgency of letting this contract to Manu-Mine (the company of reputed international fame), all taken together with the circumstances of the disguise of this contract, the actual fu-

tility of the program, and the exorbitant price charged, more than adequately establish his guilt.

Torrance, who had been a commissioner since September 2, 1943, is likewise shown to have been one of the participants in the conspiracy. Torrance attended the January, 1955, meeting at the Hotel Sterling in Wilkes-Barre. Torrance together with Evans urged at the February 28th meeting the adoption of the Manu-Mine contract and recommended the Manu-Mine company as one of international repute. Torrance accepted a gift certificate from Manu-Mine at Christmas, 1954, and earlier had permitted Manu-Mine to improve a trench silo on his farm without cost to him. Torrance admitted that he knew that Stickler was the nephew of the wife of Evans, but denied knowing that Richard Evans was connected with Manu-Mine.[11] Considering the many years of experience that Torrance had at the commission and his knowledge of its practice to have construction contracts competitively bid, considering the fact that Torrance knew of the rela-

---

[11] Torrance testified: "A. Well, when Manu-Mine [became] interested in the tunnel work and I met Mr. Evans, he indicated, or definitely said, at that time, that he [Stickler] was a nephew by marriage of Mrs. Evans. Q. Did he express that to you in Turnpike Commission meetings? A. Oh, yes, it was general knowledge in the Turnpike Commission."

The testimony of Torrance also contained the following:

"Q. Now, Mr. Torrance, when did you know, sir, that the Manu-Mine Research and Development Company was going to be awarded the February 28, 1955 contract? . . . A. In my opinion, I thought they would be the contractor. . . . Q. How long prior to February 28, 1955 did you know [think] they would be the contractor? . . . A. Well, it could have been in December. Q. 1954? A. 1954, yes."

Cleaves, a defense witness, testified that the newspaper publicity at Wilkes-Barre as to Manu-Mine contract "involved slushing in the area and it was premature, I understand, and the Commission was very much upset about it. . . . Mr. Torrance was there . . ."

tionship between Evans and Stickler, considering his friendly relationship with Stickler by reason of the work performed on Torrance's farm and the gift certificate, considering Torrance's joining with Evans in impressing Lawler with the urgency of the work and the purported good reputation of Manu-Mine in this field, together with the circumstances of the disguise of this contract, and the actual futility of the program, the guilt of Torrance is clearly established. He participated not only passively in his failure to question the contract or insist upon the customary procedures and protective provisions but he actively participated in its adoption.

By May 25, 1955, when Manu-Mine submitted its second periodical estimate for payment showing a total drilling to that time of over 21,992 feet, it was obvious that the rate of drilling had substantially increased, that this was a construction job, and that the total cost of the drilling program was becoming excessive. The magnitude of this enterprise was evident then and should have provoked inquiry on the part of Evans and Torrance.[12] Their making payments thereon and thereafter is an added circumstance demonstrative of their guilt in the conspiracy.

The defendant Paul J. McNeill was the finance director of the commission during the period of negotiating, obtaining, and performing the Manu-Mine contract. The evidence, however, fails to show that McNeill participated in any way in the negotiation and the obtaining of the Manu-Mine contract which is one of the essential fraudulent acts charged in the indictment. While it is true that a person who is not initially involved in the conspiracy may join that con-

---

[12] The magnitude of this construction work caused McNeill to request a performance bond and a labor and materialmen's bond at about this time.

spiracy in some later stage of its performance (*Com. v. Rogers,* 187 Pa. Superior Ct. 471, 482, 144 A. 2d 662), the evidence does not establish anything on the part of McNeill which aided in perpetrating the fraud or its concealment. On the contrary the evidence shows that McNeill recognized the contract as one for construction, set it up in the budget as being paid out of the construction fund and at his instance required Manu-Mine to furnish a performance bond and a labor and materialmen's bond for the protection of the commission. That he approved the payments to be made without the usual 10 per cent retention and on the basis of the billed footage may be explained as to him by the fact that he did not participate in the initial conspiracy to obtain the contract and was apparently applying the contract literally according to its provisions. In fact, a Commonwealth witness, Franklin V. Summers, assistant director of finance under McNeill, testified that he approached McNeill when he noticed that C. J. Guldin, district construction engineer, was deducting a 10 per cent retention, and that he, Summers, stated to McNeill that according to the way he read the contract the retention was not called for; McNeill simply confirmed his interpretation of the contract in this respect. The actions of McNeill were not entirely consistent with his guilt, but in some respects may have indicated an attempt to protect the interest of the commission. If McNeill were acting in furtherance of the conspiracy and for its concealment, he probably would not have given the contract the attributes of a construction contract or have belatedly required the protective bonds at a cost of $30,000 to Manu-Mine. Although we recognize that McNeill's acts and conduct displayed questionable judgment and created a suspicion as to his intentions and his connection with Manu-Mine, we cannot say that they established his guilt as charged in the indictment be-

yond a reasonable doubt. The judgment of sentence as to McNeill on the indictment charging conspiracy will be reversed and defendant will be discharged.

Stickler and Landsidle are so obviously implicated as to require little comment. Stickler built his company and his own personal profit almost at the sole expense of the commission. Stickler was quick to recognize the profitable possibilities available at the commission. The series of contracts let to Manu-Mine in connection with the selection of the route across the anthracite coal measures, the patrolling thereof, the preparation of data and the making of exploratory survey all evidence the favoritism utilized by Stickler. Landsidle, although he had no ownership interest in Manu-Mine, was its general manager and actively participated in the project resulting in the defrauding of the commission. Stickler and Landsidle discussed the drilling work and decided that they would propose to the commission that they be given the contract; they negotiated with the commission and when they were questioned about the price proposed for drilling they submitted a cost analysis that was fictitious and based upon a drill which they did not at that time intend to use in the performance of the work. They performed a grossly excessive amount of drilling which was useless to the extent of as much as 95 per cent and for this they charged the commission the exorbitant price obtained by their fraudulent cost analysis. They claimed to have been performing engineering work, still when they realized the very substantial increase in the drilling rate and the sharp rise in profit therefrom they as engineers did not attempt to inform the commission of this development.

Both Stickler and Landsidle profited to a large extent from their fraud. As we have previously indicated Manu-Mine had a profit after all expenses amounting to approximately $4,000,000 under this con-

tract, or more than 100 per cent over cost. If overhead expenses, which included substantial bonuses to employes, advertising costs, and other such expenses, are excluded, the operating profit was over $5,000,000. Included in some of the overhead expenses was furniture in the amount of $10,000 purchased by Stickler for his home; gifts to Torrance and John D. Paul; a portion of the cost of two fur coats for the wife of Stickler; and a trip by Stickler and his family to Honolulu. For the year 1955 Stickler received a salary of $32,300 plus a bonus of $35,000; Richard Evans received a salary of $10,500 and a bonus of $20,000; and Landsidle received a salary of $13,496 and a bonus of $26,700. As we have said, the stock owned by Stickler, his wife, and Richard Evans increased from $100 per share to over $42,000 per share. That Landsidle was not an owner of Manu-Mine is unimportant. He actively participated with Stickler in the negotiation of this contract; he signed and submitted the fraudulent cost analysis; he signed and submitted the periodical estimates for payment; and he personally profited from the fraud through his substantial salary and bonus.

The evidence is sufficient to convict Stickler and Landsidle of conspiracy; it sustains as well their convictions of the crime of fraudulent pretense in obtaining the contract and in obtaining or attempting to obtain payments thereunder. The crime of fraudulent pretense is completed when there co-exists a false pretense, an obtaining of property of value thereby, and an intent to cheat and defraud. *Com. v. Hancock*, 177 Pa. Superior Ct. 585, 592, 112 A. 2d 407. In the course of negotiating for this contract Stickler and Landsidle submitted at the request of John D. Paul, the commission engineer, a cost analysis to substantiate their price of $12.50 per foot of drilling. It is unnecessary to detail the matters outlined in that analysis except

to state that it purported to justify the $12.50 per foot cost of drilling on the basis of the actual cost to perform the work with a Joy No. 32 drill at a rate of 28 feet per drill per shift plus a profit of 10 per cent. The cost analysis was false. Stickler and Landsidle submitted the analysis at a time when they knew they were not going to use the drill; they knew prior to the adoption of the contract that they were going to use a heavier drill and in fact had planned for its operation. They knew that the work could not be accomplished by the drill that they proposed although it was submitted none the less in justification of the price. "A criminal false pretense has been said to be 'the false representation of an existing fact, whether by oral or written words or conduct, which is calculated to deceive, intended to deceive, and does, in fact, deceive, and by means of which one person obtains value from another without compensation.'" *Com. v. Gross,* 161 Pa. Superior Ct. 613, 618, 56 A. 2d 303, 306. The submission of a cost analysis in justification of a price about to be inserted in a contract is a representation of an existing fact; it is a representation of the facts and circumstances of the operation upon which the price is based. Cf. *Com. v. Hancock,* supra, 177 Pa. Superior Ct. 585, 593, 112 A. 2d 407. Both Stickler and Landsidle prepared and were familiar with the cost analysis which was signed by Landsidle. It was admitted that they intended the commission to rely upon the analysis. An additional consideration is the fact that in August, 1956, after Manu-Mine had been suspended from the work, Stickler, Landsidle, and Luke prepared another cost analysis in justification of the $12.50 price. That Stickler and Landsidle intended to deceive and that they did deceive are clear beyond question; the $12.50 price which they had "justified" was incorporated into the agreement. Stickler and Landsidle obviously obtained

something of value; they obtained initially the contract and thereafter, because of their initial fraud, continued to obtain payments under the periodic estimates. As to those estimates which were not paid, they were guilty of an attempt to commit the crime of fraudulent pretense.

The guilt of Evans and Torrance on counts 1 and 2 of the misbehavior in office indictments is substantiated by the evidence. Both Evans and Torrance were charged with misbehavior for corruptly participating in the negotiation and obtaining of the Manu-Mine contract, for willfully and corruptly permitting the Manu-Mine contract to become effective thereafter, and for permitting payment of vast sums of money pursuant thereto. Misbehavior in office is a common law offense. *Com. v. Brownmiller*, supra, 141 Pa. Superior Ct. 107, 120, 14 A. 2d 907. The offense occurs when there is a breach of a positive statutory duty or the performance by a public official of a discretionary act with an improper or corrupt motive. *Com. v. Peoples*, 345 Pa. 576, 579, 28 A. 2d 792; *McNair's Petition*, 324 Pa. 48, 55, 187 A. 498. Evans and Torrance here were charged with the performance of a discretionary act with an improper or corrupt motive. A discretionary duty must be exercised with reason as opposed to caprice or arbitrary action; the term discretion " 'imports the exercise of judgment, wisdom, and skill, as contradistinguished from unthinking folly, heady violence, and rash injustice.' " *Com. v. Brownmiller*, supra, 141 Pa. Superior Ct. 107, 120, 14 A. 2d 907, 913. In its penal sense misbehavior in office does not encompass mere errors in judgment or departures from sound discretion, but an official must perform those official duties which require the exercise of a sound discretion to the interest of the Commonwealth and not capriciously, arbitrarily, and with a willful and corrupt design. *Com. v. Brownmiller*, supra, 141 Pa.

Superior Ct. 107, 120, 121, 14 A. 2d 907. The willful and corrupt motive need not arise from personal benefit. See *Com. v. Brownmiller*, supra, 141 Pa. Superior Ct. 107, 121, 122, 14 A. 2d 907. In this instance Evans and Torrance, both of whom had many years of experience at the commission, permitted the blatant disguise of this contract, ignored their normal protective procedures, and in fact actively participated in inducing Lawler to go along with the contract by stressing its urgency and the qualifications of Manu-Mine to do the work. This they did for the benefit of Evans' relatives, arbitrarily casting aside what should have been a proper concern for the interests of the commission. There is no reasonable conclusion other than that they favored Manu-Mine in this contract, as they had with other contracts in the past, without regard to their official obligation to the commission. This was willful and corrupt.

It is also clear that the conspiracy charge and the charges of misbehavior in office were separate and distinct and did not merge or require an election on the part of the Commonwealth. The charges and proofs of misdemeanor in office were broader than the statutory offense of conspiracy. See *Com. v. Falls and Sykes*, 107 Pa. Superior Ct. 129, 134, 162 A. 482; *Com. v. Kline*, 107 Pa. Superior Ct. 594, 604-607, 164 A. 124; *Com. v. Ackerman*, 176 Pa. Superior Ct. 80, 83, 106 A. 2d 886. The fact that both offenses related to and grew out of one transaction is not controlling; the test is whether the proof of each charge requires an additional fact which the other does not. *Com. v. Falls and Sykes*, supra, 107 Pa. Superior Ct. 129, 133, 162 A. 482.[13]

---

[13] In *Com. v. Falls and Sykes*, 107 Pa. Superior Ct. 129, 134, 162 A. 482, 483, it was stated: "True, the indictment for malfeasance in office was based on charges of extortion, bribery and

Torrance was also charged, in the third count of the indictment charging misbehavior in office, with hampering, obstructing, and corruptly interfering with the proper and legitimate investigation of the contractual activities of Manu-Mine with the commission. Torrance argues that there is no such crime either common law or statutory. In the alternative it is argued that if there is such a crime the evidence does not sustain his conviction thereof. The Commonwealth contends that the indictment charges a common law crime under the doctrine of *Com. v. McHale,* 97 Pa. 397, 408. The doctrine of the *McHale* case is based upon the authority of Blackstone and propounds a comprehensive classification of conduct which may amount to common law offenses. According to this doctrine conduct which especially affects the Commonwealth, which is against the public peace, morals, or economy, or the due regulation and domestic order of the state, is considered a common law offense. It is stated that " '. . . the individuals of the state like members of a well-governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood and good manners, and to be decent, industrious and inoffensive in their respective stations. This head of offenses must therefore be very miscellaneous, as it *comprises all such crimes as especially affect public society,* and are not comprehended

violation of the liquor laws. The essence of that offense is a breach of official duty. If the misconduct happens to consist of the commission of other misdemeanors, there is no merger. An offender cannot escape punishment for the other offenses; they are independent crimes—the same as an agreement to commit a misdemeanor is a conspiracy. But, as we have seen, that offense is exclusive of the acts that follow; the latter is but evidence of the former. So, the other crimes, while evidence of malfeasance in office, are separate and distinct offenses. Each indictment required proof of an additional fact which the others did not."

228

under any of the four preceding series [of common law offenses].'" *Com. v. McHale,* supra, 97 Pa. 397, 408. Conduct is indictable as a common law offense under this doctrine even in the absence of specific common law precedent or statutory declaration. See *Com. v. Cano,* 182 Pa. Superior Ct. 524, 532, 533, 128 A. 2d 358. The *McHale* doctrine is applicable to such conduct which is inherently offensive to the public peace, morals, and economy. *Com. v. Cano,* supra, 182 Pa. Superior Ct. 524, 535, 128 A. 2d 358. We think that the willful and corrupt hampering, obstructing, and interfering with a proper and legitimate investigation to the scandal, dishonor, and prostitution of public justice amount to a common law offense within the doctrine of the *McHale* case.

However, we are of the opinion that the evidence does not sustain the charge against Torrance in this instance. It appears that on February 27, 1956, the commission met with the Governor of the Commonwealth in connection with the investigation of the slushing program. At this meeting the Attorney General expressed the desire to coordinate the investigations of the contracts for drilling, casing and slushing which were being conducted (1) by the State police, (2) under orders of the Attorney General, and (3) by the Secretary of Mines and Mineral Industries. Commissioners McSorley and Lawler were in general agreement with the plan but Torrance took exception to this method of procedure, and stated that the investigation should be made by the commission itself in as much as the building of the turnpike system was a responsibility of the commission. At the time of this meeting the Department of Mines had already begun its investigation. Thereafter, on March 5, 1956, McSorley took virtually the same position in a letter written to the Attorney General. There is no indication that Torrance did not otherwise co-operate in the investiga-

tions that were being conducted or that the investigations were hampered, obstructed, or subjected to interference. The Commonwealth also relies on the fact that Torrance sent copies of the reports of the investigations by the Department of Mines and the State police to Manu-Mine. This was done, however, with the knowledge and approval of the commission counsel or the Commission Chairman McSorley, and was made known at the commission meetings. The evidence does not establish the offense charged; the conviction on count 3 of the indictment charging Torrance with misbehavior in office will be reversed.

### III. Alleged Trial Errors

Numerous matters raised on these appeals relate to alleged trial errors and are set forth in support of defendants' motions for new trial. Included in this phase of the case are errors alleged to have occurred in the refusal of bills of particulars, in the consolidation of indictments for trial, in refusing defendants' requests for offers of proof, in the admission of evidence, in the refusal of defendants' points for charge, and in the charge of the court.

In reviewing the alleged errors it is well to recognize that "Mere error in the abstract is not sufficient to warrant a retrial, and where the conclusion is inescapable that the error did not influence the jury against the accused, or deprive him of his legal right to a fair trial, a new trial will not be granted." *Com. v. Linkowski,* 363 Pa. 420, 424, 70 A. 2d 278, 280. The errors must be found to have been prejudicial.

Defendants assert that it was prejudicial to refuse their motions for bills of particulars. Where an indictment is sufficient as a matter of law but does not furnish sufficient information to enable the defendant to prepare his defense, the court may order a bill of particulars to be filed. *Com. v. New Bethlehem Borough,*

15 Pa. Superior Ct. 158, 164; *Com. v. Hershman,* 171 Pa. Superior Ct. 134, 139, 90 A. 2d 314. The indictments in the instant case are sufficient in law and set forth specifically the offenses charged. A reading of the indictments demonstrates that the crimes are clearly defined, and that the details thereof are set forth with reasonable particularity. A bill of particulars, even when required, is not meant to be a specification of every item of evidence to be adduced by the Commonwealth. *Com. v. Buccieri,* 153 Pa. 535, 547, 26 A. 228.[14]

Upon motion of the district attorney, to which the defendants objected, the court permitted the consolidation of the indictments for trial. The general rule is that the court in its discretion may consolidate two or more indictments for trial where the offenses charged are similar, related, or connected unless substantial prejudice will result to the accused. *Com. v. Krzesniak,* 180 Pa. Superior Ct. 560, 567, 119 A. 2d 617. The consolidation of a conspiracy indictment with other related charges will normally not be disturbed where it appears the evidence that was admissible on the crimes charged in the other indictments tended to support the conspiracy charge. *Com. v. Dixon,* 179 Pa. Superior Ct. 1, 5, 115 A. 2d 811. The consolidation for trial of indictments charging conspiracy and misdemeanor in office has been recognized. *Com. v. Ackerman,* supra, 176 Pa. Superior Ct. 80, 85, 106 A.

---

[14] A related principle was recently stated:

" 'The general rule is that the accused has no right to the inspection or disclosure before trial of evidence in the possession of the prosecution' . . . The matter of permitting a defendant to examine and inspect evidence in the keeping of the Commonwealth depends upon an exercise of judicial discretion in any instance and our trial courts can be trusted to exercise it wisely." Concurring opinion, *DiJoseph Petition,* 394 Pa. 19, 23, 145 A. 2d 187, 188.

2d 886. And, in general, defendants charged with conspiracy should be tried together. *Com. v. Antico*, 146 Pa. Superior Ct. 293, 311, 22 A. 2d 204.

Defendants contend that the conspiracy indictment and the fraudulent pretense indictment against Stickler and Landsidle were repugnant, and that the joint trial of these indictments resulted in prejudice in the admission, segregation, and limitation of various portions of evidence. The conspiracy indictment charged the nine defendants with an unlawful combination to defraud the commission, particularly with respect to the Manu-Mine contract of February 28, 1955, and the payment of money in accordance therewith. The fraudulent pretense indictment, in the first count, charged that Stickler and Landsidle made willful misrepresentations to the commission, its employes, and agents as a result of which they unlawfully obtained the February 28th contract from the commission, and the signatures thereto of Evans, Torrance, and Theodore S. Paul with intent to cheat and defraud the commission. The indictments are not repugnant simply because Evans and Torrance were named as principals in the conspiracy indictment and as the agents of the commission, who signed the same contract, in the fraudulent pretense indictment. The defrauded party in the latter indictment was the Pennsylvania Turnpike Commission, a separate legal entity. Act of May 21, 1937, P. L. 774, §4, 36 PS §652d. Evans and Torrance were not the victims in the fraudulent pretense indictment; their signatures represented the legal authority of the commission, which they were charged with abusing. An entity such as the commission must of necessity act through it officers. But, if a third party colludes with some or all of the officers of the entity to obtain a contract signed by the officers on its behalf, there is none the less a fraud perpetrated upon the entity. The collusion of the officers or agents of the commis-

sion with third persons is not attributable to the com-
mission. See *Com. v. Sanderson,* supra, 40 Pa. Supe-
rior Ct. 416, 469; *Com. v. Kirk,* 141 Pa. Superior Ct.
123, 127, 14 A. 2d 914; *Todd v. Skelly,* 384 Pa. 423,
429, 120 A. 2d 906; *Fifth Street Building and Loan As-
sociation v. Kornfeld,* 315 Pa. 406, 416, 172 A. 703.
See, also, Fletcher Cyclopedia, Corporations, vol 3,
§804, p. 54.

Since the indictments charge offenses which were
not repugnant but in fact part of and related to the
general scheme, their consolidation was not an abuse
of discretion. The evidence submitted with respect to
the fraudulent pretense indictment would in material
respects be relevant and material to the conspiracy
charge. "Although the offense of criminal conspiracy
is complete the moment the agreement is made whether
acts be done in pursuance of it or not, it is still proper
for the Commonwealth to show subsequent acts and
circumstances in fulfillment of the conspiracy." *Com.
v. Bartell,* supra, 184 Pa. Superior Ct. 528, 548, 136
A. 2d 166, 177. The fraudulent pretense indictment
charged the separate crimes of Stickler and Landsidle
which were among the means used to accomplish the
object of the conspiracy. The crimes of conspiracy
and fraudulent pretense are separate and distinct.
*Com. v. Kline,* supra, 107 Pa. Superior Ct. 594, 599,
164 A. 124; *Com. v. Downer,* 159 Pa. Superior Ct. 626,
633, 49 A. 2d 516.

Evans and Torrance assert that count 1 of the
fraudulent pretense indictment is diametrically op-
posed to count 1 of the indictments charging misbe-
havior in office which charge misbehavior in partici-
pating in the negotiation and execution of the Manu-
Mine contract. These indictments are not repugnant
for the reasons just discussed. Count 1 of the fraudu-
lent pretense indictment charges that the commission,
not Evans and Torrance, was defrauded by reason of

false pretense. The same is true on the claim that count 2 of the indictments charging misbehavior in office and the balance of the counts in the fraudulent pretense indictment are repugnant. Count 2 of the indictment charging misbehavior in office charges misbehavior in permitting the Manu-Mine contract to become effective and in permitting payments to be made thereunder. Counts 2 to 17 of the fraudulent pretense indictment charged Stickler and Landsidle with obtaining the various periodical payments under the contract by means of false pretense. As we view it, these charges against Stickler and Landsidle and the charge against Evans and Torrance in permitting payment are part and parcel of the same transaction, the means used to accomplish the object of the conspiracy. That the individual role of Evans, Torrance, Stickler, and Landsidle may have resulted in separate crimes growing out of the general conspiracy is no cause for complaint.

The court below stated in its opinion:[15] "In the cases at bar the four indictments involve only three types of offenses which 'either grew out of the alleged conspiracy or otherwise were closely related.' The conspiracy to cheat and defraud the Pennsylvania Turnpike Commission of its moneys was accomplished when Stickler, Landsidle and Richard Evans obtained huge sums of money by fraudulent pretenses. By their misbehavior in office Commissioners Evans and Torrance contributed to the accomplishment of the object of the conspiracy."

Torrance further claims that the consolidation of the indictments for trial resulted in prejudice in the admission of evidence on the misbehavior indictment. It is alleged that certain evidence was admissible only

---

[15] The opinion of the court below is reported in 72 Dauphin County Reporter 31.

on the conspiracy charge but that the trial judge refused to limit such evidence to that charge.

It is generally recognized that where a separate offense is related to, or grows out of, the conspiracy the evidence admissible on the separate offense tends in most instances to support also the conspiracy indictment. See *Com. v. Dixon,* supra, 179 Pa. Superior Ct. 1, 5, 115 A. 2d 811; *Com. v. Quinn,* 144 Pa. Superior Ct. 400, 404, 405, 19 A. 2d 526. But the novel question raised here by Torrance is whether the converse is true, that is, whether the evidence admissible on the conspiracy charge is also itself admissible on the separate indictments, and, if not, whether it was error not to limit the evidence to the conspiracy charge. The answer must depend upon the particular offense charged in addition to the conspiracy. Here two counts of the indictment charging misbehavior in office against Torrance concerned his participation in the conspiracy in the negotiation and procurement of the Manu-Mine contract, and in his permitting payments to be made as a result of the conspiracy. Evidence which would establish the conspiracy, within which Torrance was an actor, was relevant therefore to the separate misbehavior charge involving his participation therein. It was not necessary that every item of evidence on the conspiracy charge be directly applicable to the misbehavior charge, or otherwise require a limiting instruction by the trial judge. The crimes, although separate and distinct, were related. To establish the conspiracy was to aid in establishing that Torrance, who participated therein, had misbehaved in office in respect to the negotiation and execution of the contract and the making of payments thereunder.

Evans raises a similar contention, except that in his case the trial judge repeatedly instructed the jury that certain evidence was not to be considered on the misbehavior indictment. Generally, the trial judge

gave these instructions when the evidence related to matters occurring after Evans left the commission upon the expiration of his term. Evans now contends that as the evidence in many instances was limited to the conspiracy charge it could only have the effect of confusing the jury; he thus concludes that the indictments should not have been consolidated. We see no such results. Evans admits that the rulings were "correct from a legal standpoint." The repeated instructions could only have had the effect of impressing upon the jury that Evans was not to be held on the misbehavior charge for matters occurring after he left office.

Stickler and Landsidle raise a like contention with respect to the fraudulent pretense indictment. They likewise argue that the consolidation was prejudicial because certain evidence in the conspiracy case prejudiced them on the fraudulent pretense indictment notwithstanding the limiting instructions of the trial judge. Our examination of the record discloses no substantial harm resulting in this manner from the consolidation. One instance indicated by defendants concerned the introduction into evidence of the testimony of John D. Paul before the investigating grand jury as an admission against himself. The trial judge repeatedly cautioned the jury that the testimony was to be considered against Paul and no other defendant. Another instance concerned the testimony of five Manu-Mine inspectors as to certain irregularities in the slushing program. This testimony, offered in rebuttal, was limited to contradicting certain defense witnesses. It was thoroughly and repeatedly explained to the jury that it was received solely for that limited purpose. We cannot see how Stickler and Landsidle were prejudiced under the circumstances. The instructions were adequate and clear. For the most part the evidence demonstrated the general course of conduct

tending to the same general end. *Com. v. Dixon,* supra, 179 Pa. Superior Ct. 1, 5, 115 A. 2d 811.

That the consolidation of these four indictments, charging in substance three offenses, did not result in such confusion of the jury as to convict regardless of the evidence is indicated to some degree by the fact that four of the nine defendants were acquitted in the trial. Cf. *Com. v. McHugh,* 187 Pa. Superior Ct. 568, 574, 145 A. 2d 896.

A related contention of defendants is that the verdicts on the fraudulent pretense indictment and the verdicts on the conspiracy indictment are inconsistent and repugnant because Evans and Torrance are alleged to be the victims in the fraudulent pretense indictment and the conspirators in the other. We have shown, in discussing the consolidation of these indictments for trial, that they are not inconsistent or repugnant. It was not necessary to a conviction of Stickler and Landsidle on the fraudulent pretense indictment that the jury find that Evans and Torrance were deceived by the false representations. The indictment charged that the willful misrepresentations were made to the commission, its employes, and agents. Evans and Torrance were not the only agents of the commission. Moreover, the jury acquitted Theodore S. Paul whose signature also appeared on the contract. Having found that Theodore S. Paul was not a conspirator, the jury may have found that he, as well as other employes of the commission, was deceived by the false representations.

Defendants allege error in the refusal of the trial judge to require the Commonwealth to make offers of proof before reception of the testimony of all but the first few witnesses. Within the discretion of the trial judge, a party producing a witness may be called upon to state what is proposed to be proved by his testimony so that the court may determine whether it will be in-

competent, irrelevant, or inadmissible. *Morgan v. Browne,* 71 Pa. 130, 136; *Scott v. Lindgren,* 97 Pa. Superior Ct. 483, 487. See, also, Henry, Pennsylvania Evidence, vol. 2, §727, p. 157. The practice of requiring an offer is intended to aid the fair and orderly trial of the case; its practical enforcement depends largely upon the circumstances at the moment the question arises. *Myers v. Kingston Coal Company,* 126 Pa. 582, 601, 17 A. 891. Where persistent offers of proof are requested and would have the effect, if granted, of unnecessarily delaying the trial and disturbing its normal course, refusal would not appear to be improper. The court below in its opinion explained the exercise of discretion: "We were convinced at the trial that to require the Commonwealth to make an offer before affording it an opportunity to ask a question on the subject concerning which the witness was called, would have obstructed rather than aided the fair and orderly progress of the trial. Moreover, in a trial lasting over seven weeks it is not likely that the defendants were taken by surprise because of the lack of offers." It is obvious that requiring an offer of proof before each Commonwealth witness testified would prolong the trial unreasonably. Although defendants may have been refused offers of proof prior to the testimony of each witness, they still had the right to object to specific questions asked of the witnesses when it appeared that such questions might elicit incompetent, irrelevant, or inadmissible testimony. We are of the opinion that the trial judge did not abuse his discretion in refusing the requests for offers of proof. See *Hill v. Canfield,* 56 Pa. 454, 457.

Defendants next allege certain errors in the admission of evidence.

Defendants contend that the trial judge erred in permitting two witnesses to testify as to the law of Pennsylvania applicable to the commission and its

power to contract. At the beginning of the trial, the Commonwealth called Harrington Adams, a deputy attorney general, who read into evidence section 4 of the Act of May 21, 1937, P. L. 774, No. 211, 36 PS §652d, which created the Pennsylvania Turnpike Commission and made it an instrumentality of the Commonwealth. Adams also read the provision in section 4 giving the commission the power to contract, with the proviso that contracts relating to construction shall be approved by the Department of Highways and that such construction be under the supervision of the Department of Highways. Adams then read into evidence the portions of the Act of September 27, 1951, P. L. 1430, as amended, 36 PS §660.2, 660.6, which created the Northeastern Extension of the Pennsylvania Turnpike and gave the commission the power to contract for its construction subject to the same approval and supervision by the Department of Highways.

John R. Rezzolla, Jr., chief counsel for the Department of Highways, also testified as to the statute. Over objection, Rezzolla read into evidence sections 401 to 406 of the State Highway Law, Act of June 1, 1945, P. L. 1242, 36 PS §§670-401 to 670-406, relating to the construction of State highways, to the requirement of advertising for proposals, to the awarding of contracts on competitive bids, and to the manner of execution of construction contracts. Over objection, Rezzolla explained the procedures within the Department of Highways relative to advertising for bids and the method of awarding contracts on bids. Likewise, Rezzolla testified that, as to contracts of the commission which are required to have the approval of the Department of Highways, the department has a liaison officer at the commission whose duty it is to render such approval, and that the Manu-Mine contract was not approved in that manner. On cross-examination, Rezzolla testified that the standard requirements in

the State Highway Law, such as advertisement for bids, apply only to contracts of the Department of Highways and do not set forth the standards to be followed by the commission in awarding its construction contracts. He further testified that none of the construction contracts of the commission approved by the Department of Highways were handled by the department in the same manner as its own construction contracts; and that the approval by the Department of Highways of commission contracts did not necessitate such procedure.

It is the general rule, as contended by defendants, that the trial judge, not expert witnesses, should give instructions to the jury on domestic law and its application to the case. *Com. v. Giltinan,* 64 Pa. 100, 105; *Com. v. Walker,* 178 Pa. Superior Ct. 522, 528, 116 A. 2d 230. But we perceive no harmful effect in having the actual provisions of the law read into evidence, as here, from the pamphlet laws. Contrary to defense contentions, the witnesses, by reading the provisions to the jury, did not give an opinion or interpretation of the laws as applied to this case. While it may also be true that the provisions of the State Highway Law, as read by Rezzolla, were not applicable to commission contracts, this fact was brought out by defendants on cross-examination and cured any error in permitting that law to be read. It is our opinion that any error in this instance was a harmless one. *Com. v. Fugmann,* 330 Pa. 4, 17-19, 198 A. 99. The trial judge did not charge the jury that the provisions of the State Highway Law applied to commission contracts; in fact, he affirmed and read a point of defendants for charge to the effect that the provisions of the State Highway Law relating to advertisement for bids did not apply to the commission.

The Commonwealth issued a subpoena to Clyde J. Siegfried, controller of Manu-Mine, to present certain

corporate books and records. The records were in the possession of Stickler. When Siegfried was called as a witness and questioned as to whether he had such records, counsel for Stickler stated that it was not desired that anything be concealed and that the records shown to be relevant would be produced. The trial judge ordered the records requested by the Commonwealth to be produced and the witness thereafter testified therefrom. It is alleged that the manner of calling for the production of the records was prejudicial, and that the trial judge had no power to order a defendant to produce corporate records.

It is true of course that the Commonwealth may not call upon a defendant, in the presence of the jury, to produce incriminating evidence against himself. *Com. v. Valeroso*, 273 Pa. 213, 216, 116 A. 828; *Com. v. Hubbard*, 65 Pa. Superior Ct. 213, 216. But the privilege against self-incrimination in this respect does not extend to corporate records. "It is settled that a corporation is not protected by the constitutional privilege against self-incrimination. A corporate officer may not withhold testimony or documents on the ground that his corporation would be incriminated. . . . Nor may the custodian of corporate books or records withhold them on the ground that he personally might be incriminated by their production." *Curcio v. United States*, 354 U. S. 118, 122, 77 S. Ct. 1145, 1 L. Ed. 2d 1225, 1229. The books and papers of a corporation are not the property of the officers and may be used against them. *McElree v. Darlington*, 187 Pa. 593, 595, 41 A. 456.

That the colloquy between counsel and the trial judge took place before the jury was due primarily to counsel. Counsel interrupted the questioning of Siegfried relative to the subpoena by stating that the documents were in the possession of Stickler, and that they would be produced if shown to be relevant. Coun-

sel could easily have made the remarks at side bar beyond the hearing of the jury if it were so desired. The contention is without merit.

It is next argued that the trial judge erred in admitting into evidence as business records the engineering tabulations attached to Commonwealth's exhibits 30 to 49, inclusive, and in the use made of these exhibits. Exhibits 30 to 49 are the periodical estimates for payment submitted by Manu-Mine under the contract. Attached to those periodical estimates are the measurements taken by the commission inspectors which indicate that their measurements of certain holes showed a depth short of the footage billed by Manu-Mine. Despite the short-of-billed footage appearing on the estimates, Manu-Mine was paid for the amount billed without deduction of the shortage. On the basis of the exhibits and the testimony in connection therewith, the trial judge submitted to the jury the question whether Manu-Mine had sent in estimates and received payments for holes actually short-of-billed footage.

It is contended that these tabulations were improperly admitted as business records; that the testimony actually indicated that there was no shortage in the drilled footage; and that to submit this question to the jury was to permit a conviction of defendants on a charge for which they were not indicted.

We think the tabulations were properly admitted as business records under the Uniform Business Records as Evidence Act of May 4, 1939, P. L. 42, 28 PS §91b. Business records are competent evidence, in so far as they are relevant, if they are properly authenticated. The Act does not make records relevant or competent per se. It must be shown that the evidence has relevancy to the issue being tried, and the trial judge must be satisfied that the sources of information, method, and time of preparation were such as to

justify its admission. *Haas v. Kasnot,* 371 Pa. 580, 586, 92 A. 2d 171. The custodian or other qualified witness must testify to the identity of the document, the mode of its preparation, and whether it was made in the regular course of business at or near the time of the event. The engineering tabulations attached to the periodical estimates meet these tests of authenticity. The witness Franklin V. Summers, who was the assistant director of finance and audit under McNeill at the time of the Manu-Mine project, testified that these engineering tabulations accompanied the periodical estimates submitted by Manu-Mine to the commission, and that they were prepared by the district construction engineer, C. J. Guldin, or under his direction. Guldin testified that he attached the engineering tabulations to the Manu-Mine periodical estimates indicating, inter alia, the short-of-billed footage, and that these records were prepared on the basis of the records turned in by the inspectors. The Commonwealth did not call the inspectors who measured the holes but the defense did. The inspectors testified that they measured the holes, and that these measurements were turned into the field office which was in charge of Guldin.

The records and the testimony in connection therewith indicated that the billing of Manu-Mine was in excess of the depth found by the measurements of the commission inspectors. It is argued that there was a valid reason for the discrepancy and that the explanation, coming from the Commonwealth witnesses, indicated that the commission was not cheated or defrauded. With this we do not agree. The tabulations on exhibit 30 carried a notation that the holes short-of-billed footage were due to placing casing into the drilled holes which knocked loose dirt and rock therein; that certain of the holes were clogged due to deposits of material from a nearby stream; and that the

drilling contractor "will clean out short holes before slushing operations are started." Summers testified that he was of the impression that the short-of-billed footage indicated that a stoppage had occurred which would be cleaned out by the contractor and that the hole had actually been drilled to the depth indicated by the billed footage. Guldin testified to the same effect, and stated that, to the best of his knowledge, there was not a single hole billed which had not been drilled to the depth shown in the billed footage. However, except for spot checks of the holes short-of-billed footage, no complete re-check was made to determine whether the holes originally short or blocked were subsequently opened to the billed depth. The inspectors testified similarly.

The testimony of the inspectors and of Guldin and Summers was not the sole evidence in this regard.

The witness George D. Oswald, who was employed by Sullivan Trail Coal Company and Rogers Construction Company in performing the actual slushing into the voids, testified that he found the holes collapsed or filled with dirt and rock and unable to take more than a token amount of slushing material. He stated that about 60 per cent of the holes would not take the material, or more than a negligible amount, while the remaining 40 per cent took considerably less than the estimated amount of material; the holes were collapsed or blocked. Oswald added that, in certain instances when Manu-Mine discovered holes collapsed or blocked, it would simply drive several lengths of casing into the hole, causing more blockage, with the result that such hole would take only about a ton of silt as compared with the estimated 2,200 tons of silt per hole contemplated in the slushing program.

It must be remembered that the entire purpose of the Manu-Mine contract was ostensibly to drill holes down to the voids which were to be filled with silt.

The holes were the means by which the silt was to be introduced into the voids. It is therefore immaterial whether the holes were originally drilled to the depth billed; the holes could serve no purpose under the contract unless they were cased to the full depth and were suitable for introducing the silt into the underground chambers. Since the holes did not meet this purpose to the fullest extent, or even to an appreciable extent, the billing for the total amount shown on the drillers' logs was properly considered evidence of the fraud perpetrated through the conspiracy and under the contract.

Submitting these questions to the jury did not result in the conviction of defendants of a crime for which they were not indicted, as in *Com. v. Graham,* 170 Pa. Superior Ct. 343, 345, 85 A. 2d 632, and *Com. v. Vardelle,* 70 Pa. Superior Ct. 241, 244, 245. The conspiracy indictment charged that defendants contrived to defraud the commission, inter alia, "by cunning and stealth permitting the perpetration, camouflaging and nondiscovery of multitudinous acts whereby the Turnpike Commission was charged with and defrauded of millions of dollars . . ." In a conspiracy indictment, particularly one involving fraud, there is a great latitude in the reception of evidence relevant to the scheme devised and the means used to accomplish the objective. *Com. v. Sanderson,* supra, 40 Pa. Superior Ct. 416, 472, 473; *Com. v. Berman,* supra, 119 Pa. Superior Ct. 315, 326, 181 A. 244; *Walter J. Scanlan & Son v. Sherbine,* supra, 382 Pa. 376, 379, 114 A. 2d 900; *Glessner v. Patterson,* 164 Pa. 224, 229, 30 A. 355; *Com. v. Bartell,* supra, 184 Pa. Superior Ct. 528, 548, 136 A. 2d 166.

Defendants allege that it was prejudicial error for the trial judge to admit into evidence the investigating grand jury testimony of John D. Paul, one of the defendants who was acquitted by the jury. The testi-

mony was presented to the jury as an admission against Paul. The Commonwealth offered it against all defendants, but the trial judge was of the opinion that testimony given before the investigating grand jury was not in furtherance of the conspiracy and did not promote or advance the common unlawful object. Therefore, before the testimony was introduced, the jury was instructed that it was restricted to John D. Paul and was not to be considered against any of the other defendants. The testimony was lengthy. It is the contention of defendants that notwithstanding the fact that the trial judge instructed the jury that this testimony was to be considered as an admission against John D. Paul only, it nevertheless contained material which was so prejudicial to the other defendants as to have been improperly admitted. It is argued that such testimony of Paul was not admissible at all because it was not an admission but an attempt by Paul to exculpate himself while inculpating the other defendants; that those portions containing references to the other defendants should not have been read to the jury along with the admissions of Paul; and that the trial judge, although he gave cautionary instructions to the jury when the testimony was received and in the course of his charge, nevertheless improperly utilized the testimony to the prejudice of the other defendants in discussing their role in the conspiracy and fraud.

The testimony of Paul was a detailed recitation of his knowledge of the functioning of the Turnpike Commission, particularly with reference to the Manu-Mine contract. As such it necessarily would involve statements concerning the other defendants. The testimony was certainly admissible against Paul. It contained admissions notwithstanding the fact that it was not an unqualified confession of guilt. "An 'admission' as applied to criminal cases has been defined as a 'statement by defendant of a fact or facts pertinent

to the issues and tending, in connection with proof of other facts or circumstances, to prove the guilt, . . . but which is, of itself, insufficient to authorize conviction; it is a circumstance which requires the aid of further testimony to generate a reasonable conclusion of guilt.' . . . Voluntary statements made by a defendant, although they may not amount to a confession of guilt, can be used against him if they tend to explain issues on trial, . . ." *Com. v. Elliott*, 292 Pa. 16, 20, 140 A. 537, 538. Generally, where the Commonwealth desires to prove certain admissions of a defendant, it is not necessary to put in evidence his entire previous testimony. *Com. v. House*, 6 Pa. Superior Ct. 92, 104. But the entire testimony may be received as an admission where the defendant is charged with participation in a complicated criminal endeavor involving many related facts, incidents, and circumstances, most of which are set forth in the prior testimony. In such a case his entire testimony may be viewed as a whole to ascertain the full extent of defendant's admission as to his participation in the criminal plot. The testimony of Paul provided a thorough picture of this complicated conspiracy and his participation therein, whether innocent or guilty; it was properly admitted as a whole against him. The fact that the jury subsequently acquitted him does not retroactively affect the admissibility of his prior testimony. *Com. v. Berman*, supra, 119 Pa. Superior Ct. 315, 323, 326, 181 A. 244.

In a joint trial the acts and declarations of a conspirator made after the conspiracy has ended are admissible against that defendant so long as the jury is properly instructed on the limited purpose and effect of the admissions. This is true notwithstanding that the admission may make reference to the other defendants. Such was the situation in *Com. v. Berman*, supra, 119 Pa. Superior Ct. 315, 329, 181 A. 244.

We there stated (page 329 of 119 Pa. Superior Ct., page 249 of 181 A.) : ."A statement by one of several codefendants which is in the nature of a confession is admissible in evidence under proper instructions, although such a statement may indirectly influence the minds of the jury against the other defendants on trial. . . . The mere fact that evidence legally admissible against one of several defendants may prejudice his codefendant is no reason for its exclusion. . . . The Cummings statement set forth what he said he knew of the conspiracy charged, and his version of his connection with it. Such a voluntary statement by a defendant is admissible against him, although it may not contain an unqualified admission of guilt. . . . The statement by Cummings, that the scheme with which he was connected proved unfair and unethical and a scheme to defraud customers, was relevant and admissible, although he endeavored to impute the fraud to what he called the 'Berman group.' It might properly be inferred from his statement that he knew more about the scheme than he disclosed. The evidence being relevant, it was immaterial that the statement contained an expression of opinion by Cummings which might be detrimental to the appellant, a codefendant; and it was admissible if sufficiently limited by proper instructions." See, also, *Com. v. Dolan,* 155 Pa. Superior Ct. 453, 458, 38 A. 2d 497; *United States v. Griffin,* 176 F. 2d 727, 729, certiorari denied 338 U. S. 952, 70 S. Ct. 478, 94 L. Ed. 588.

The contention that, at the time the admission was offered, there was not sufficient other evidence of the conspiracy is without merit. The admission was introduced almost at the end of the Commonwealth's case. There was sufficient proof of the conspiracy at that time. As said in *Com. v. Zuern,* 16 Pa. Superior Ct. 588, 604: "The proof of the conspiracy at the point in the trial when the declarations are sought to be

introduced, need not be conclusive, but only slight, in order to permit the introduction."

At the inception of the reading of the testimony of John D. Paul, the trial judge admonished the jury that "this witness is about to be questioned concerning certain testimony alleged to have been given by one of the nine defendants in the conspiracy case, John D. Paul. The testimony you are about to hear, we emphasize, is restricted to John D. Paul alone. It applies to him alone and to no other defendant. You will keep that in mind as the testimony is given, and that applies in all of the cases that are before you for trial." This admonition was repeated later at the request of defense counsel. In the charge the trial judge instructed the jury on at least five occasions that the testimony of John D. Paul was restricted to him alone and was not to be considered against the other defendants. In addition, at the request of Evans in his points for charge, the trial judge reiterated the admonition on two occasions. We think the instructions were adequate. There was sufficient evidence presented to substantiate the conviction of the four remaining defendants, unaffected by the admission of the Paul testimony. We do not believe that the circumstances are such that the jury disregarded the admonitions of the trial judge. See *Com. v. Fugmann,* supra, 330 Pa. 4, 17-19, 198 A. 99; *Com. v. Novak,* 165 Pa. Superior Ct. 576, 581, 69 A. 2d 186. The verdicts indicate otherwise.

Moreover, it is not entirely clear that the statement of Paul was not admissible against all defendants on the basis that it was a declaration by a co-conspirator made at a time when the conspiracy had not ended. See *Com. v. Wilson,* 394 Pa. 588, 607, 148 A. 2d 234. At the time the statement was made and even at the time of trial, there was a suit pending in the Dauphin County court by Manu-Mine to collect the unpaid bal-

ance for the work performed under the contract, the fruits of this conspiracy. This could be considered evidence that the conspiracy was still in effect at the time Paul made his statement. See *Com. v. Strauss,* 89 Pa. Superior Ct. 82, 91; *Com. v. Girardot,* 107 Pa. Superior Ct. 274, 277, 278, 163 A. 362. However, there is doubt in our minds, as there was in the mind of the trial judge at the time the testimony was offered, as to the applicability of that rule to this case; we do not base our conclusion thereon. See *Krulewitch v. United States,* 336 U. S. 440, 69 S. Ct. 716, 93 L. Ed. 790. It would appear that the testimony of Paul was not given in furtherance of the conspiracy. See *Com. v. Wilson,* supra, 394 Pa. 588, 607, 148 A. 2d 234.

We note also that no specific exceptions were taken to the charge of the court in respect to the manner of the use of the Paul testimony. Objection had been made to the introduction of the testimony. *Com. v. Black,* 186 Pa. Superior Ct. 160, 166, 142 A. 2d 495.

Another contention of defendants is that the trial judge erred in permitting the Commonwealth to introduce certain rebuttal testimony at the close of the defense. The Commonwealth called five former Manu-Mine inspectors to rebut testimony given by Harry Luke and Stickler that they had no knowledge of irregularities in the slushing operations. Luke was the chief project engineer of Manu-Mine. The irregularities referred to were those in which one of the slushing contractors, Rogers Construction Company, a partnership consisting of Joseph Rogers and Amos Rogers, fraudulently induced the inspectors of Manu-Mine to give false weight slips for the amounts of materials which were allegedly slushed into the voids through the holes drilled by Manu-Mine.

Luke had testified on direct examination that, in connection with the performance of his duties on the construction of the Northeastern Extension, he knew

of no one who entered into any unlawful agreement or undertook to do any illegal or improper acts. He reiterated this on cross-examination.

Defendant Stickler testified on cross-examination that it was the alleged irregularities concerning the slushing which caused the Manu-Mine separation from the commission, and that he was of the opinion that these irregularities were not substantiated or the charges justified. The Commonwealth witness Oswald testified, as we have indicated, that the holes drilled by Manu-Mine would not accept an appreciable amount of the silt which Rogers had contracted to supply to the commission, and that as a result some way had to be found to dispose of the material. They devised the scheme of bribing the Manu-Mine inspectors to give the false weight slips and to permit the dumping of truck loads of silt about the countryside. See *Com. v. Rogers,* supra, 187 Pa. Superior Ct. 471, 475, 144 A. 2d 662; allocatur refused.

The Commonwealth offered the testimony of five former Manu-Mine inspectors, who were involved in the Rogers fraud, for the purpose of attacking the credibility of Luke and Stickler. The trial judge, over objection, permitted the testimony. The jury was instructed that it was not evidence that any offense was committed by any of the defendants, and that it was to be considered for the sole purpose of aiding the jury in passing upon the credibility of Luke and Stickler with respect to their testimony about the irregularities in the slushing program. The testimony of these five rebuttal witnesses was to the effect that, as Manu-Mine inspectors, they had entered into the agreement to give fictitious weight slips for loads of silt not delivered and to look the other way when silt was dumped about the countryside. They testified that they knew that the commission consequently was making payments to Rogers which were not properly due and that

the commission was cheated by their conduct. None of the witnesses imputed knowledge of these irregularities to Luke or Stickler.

Defendants contend that this was highly prejudicial testimony in that it was not proper rebuttal to the testimony of Luke and Stickler, and that its effect was to permit the jury to hear evidence of crimes which were not charged in the indictments and in which no defendant was a participant.

A witness cannot be contradicted on matters which are not germane to the issue being tried, that is, on a collateral matter. *Com. v. Petrillo*, 341 Pa. 209, 223, 19 A. 2d 288; *Com. v. Burdell*, 380 Pa. 43, 50, 51, 110 A. 2d 193. Whether the evidence relates to a matter which is collateral depends upon its admissibility for some purpose independent of the contradiction. *Com. v. Petrillo*, supra, 341 Pa. 209, 224, 19 A. 2d 288. It is equally true that evidence of crimes other than those charged in the indictment is not admissible unless it serves one of the recognized purposes of evidence of that nature. Likewise, in *Com. v. Wable*, 382 Pa. 80, 84, 114 A. 2d 334, 336, it was said: ". . . evidence of other crimes *is* admissible when it tends to prove a common scheme, plan or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others . . ." The testimony of the inspectors concerned a fraud in which they and Rogers engaged apparently without participation by any of these defendants.

Separate and disconnected acts and declarations of persons who were not defendants, or shown in any way to have been connected with them, made in their absence without their knowledge may not be admitted in the trial of the defendants. *Com. v. Duffy*, 49 Pa. Superior Ct. 344, 355. But this was not a case of introducing other distinct crimes which might prejudice the trial of these defendants. The testimony of the

Manu-Mine inspectors was not limited to the commission of crimes. They testified to facts existing in the slushing operation which, by reason of the contract, was under the direct supervision of Manu-Mine.[16] Oswald had testified that the Rogers fraud and conspiracy arose because the holes drilled by Manu-Mine were in such condition that the material which Rogers was supplying could not be used for the contemplated purpose. The fraudulent scheme was devised by Rogers and the Manu-Mine inspectors to charge for the undelivered silt or dispose of it and to receive payment from the commission for material not used in the slushing program. That this evidence showed criminal conduct on the part of the Manu-Mine inspectors and Rogers does not affect the admissibility of the facts concerning the failure of the drilling and supervising program of Manu-Mine to meet its ostensible purpose. We have previously noted that there is wide latitude in a trial on an indictment for conspiracy to defraud. Certainly the inability of the holes drilled by Manu-Mine to accept more than a negligible amount of the silt contemplated in the slushing program, and the fraudulent acts of the inspectors were the direct result of the original conspiracy and fraud perpetrated in obtaining the Manu-Mine contract and in the performance thereof. The evidence presented by the Manu-Mine inspectors was directly related to the conspiracy. The testimony of these inspectors was an elaboration upon and corroborative of that of Oswald which had been presented in the Commonwealth's case in chief. The testimony did not relate to a collateral matter but to one germane to the issue, and it was proper to permit it in rebuttal. Where evidence would have been admissible in the Commonwealth's case in chief it may

---

[16] For supervision of the slushing program Manu-Mine was paid $121,722.90.

properly be received in rebuttal for the purpose of contradicting the testimony offered by the defendant. This is a matter which is largely within the discretion of the trial judge. *Com. v. Adams,* 174 Pa. Superior Ct. 504, 508, 102 A. 2d 202. It is noted that the trial judge clearly limited the testimony to the narrow issue of credibility on one phase of the defense testimony.

It is next argued that the trial judge erred in permitting the Commonwealth witness James H. Pierce to interpret and comment upon the contract of February 28, 1955. Pierce, an engineer of considerable experience in mining, and construction engineering in general, testified on behalf of the Commonwealth as an expert. Defense counsel objected to this testimony. He gave as his opinion that the language in the contract, with the exception of one portion thereof, was constructural; in fact, that it was a construction contract. He stated further that the contract was an unusual one in that it contained no specifications, that there was no limitation on the number of feet to be drilled, that there was no re-negotiation clause in view of the cost analysis submitted by Manu-Mine, no escalation clause, no usual retention clause, and no requirement of a performance bond. We think the testimony of this expert, as well as that of the other experts who testified on behalf of the Commonwealth, was admissible. "Expert testimony is admissible in all cases, civil and criminal alike, when it involves explanations and inferences not within the range of ordinary training, knowledge, intelligence and experience." *Com. v. Nasuti,* 385 Pa. 436, 443, 123 A. 2d 435, 438.

Certainly the contract of Manu-Mine was unusual. It was the contention of the Commonwealth that the contract related to construction although it was made to appear to be an engineering contract as a means

devised by the conspirators to defraud the commission. Under the law construction contracts of the commission are required to bear the approval of the Department of Highways. Other evidence indicated that it was a general procedure of the commission that construction contracts be submitted for bids, have a retention clause, and require a performance bond. If this contract was disguised as an engineering contract to avoid the normal procedure of competitive bidding, to avoid the normal manner of approval by the Department of Highways, and consequently to avoid discovery of the fraud, then it was important that the question of its true nature, engineering or construction, be thoroughly investigated. The fields of construction and engineering as they relate to surface support, drilling, and slushing are certainly not within the realm of common knowledge, intelligence, and understanding; they require specialized training. The Commonwealth therefore properly introduced evidence in the form of the testimony of experts to establish that this was in reality a construction contract in whole or in major part. Drilling for the purpose of reaching the voids to be flushed was, in the opinion of the experts, construction work; and it was on the basis of the price charged for drilling and the amount of drilling done that Manu-Mine received virtually all of the payments under this contract. We recognize that it is normally the duty of the court to interpret a contract; however, when that interpretation requires technical and expert knowledge the testimony of experts may be received to aid in that interpretation. Actually Pierce was not interpreting this contract or the Act of the Legislature; he was testifying from his expert knowledge and experience as to the nature of the *work* to be performed under the contract, as to the manner in which that work was disguised by the wording of the contract, and as to the lack of

provisions which appear in the usual construction con-
tract for work of this nature. Cf. *Com. v. Sanderson,*
supra, 40 Pa. Superior Ct. 416, 467. The testimony
was properly admitted and submitted to the jury in
connection with the means devised by the conspirators
to succeed in their plan. That these requirements were
not technical legal requirements is of little significance
in view of the fact that the commission had adopted
them as a general practice in the case of construction
contracts.

Defendants further contend that there was error in
submitting to the jury the question whether the con-
tract of February 28, 1955, was a construction con-
tract. The trial judge instructed the jury to determine
whether the contract was an engineering or construc-
tion contract and to consider, if it were a construction
contract, whether it should have been competitively
bid. Defendants assert that the instructions had the
effect of making the jury's verdicts depend upon
whether or not the jury considered the contract a con-
struction contract. They argue that under the instruc-
tions, if the jury considered the contract a construc-
tion contract, it would be obliged to convict since the
contract was not awarded after competitive bidding.
Actually the nature of this contract was a basic issue.
The failure to have had the contract submitted for
bids was likewise an important factor in the fraud.

The Commonwealth experts had testified that the
drilling, the major portion of the work under the con-
tract, was clearly construction. The evidence of the
Commonwealth also established that, with some excep-
tions, the contracts on the Northeastern Extension
relating to the construction of the roadway, its grad-
ing, drainage, and structures, were competitively bid,
and were approved by the Department of Highways
in the normal manner established at the commission.
It was shown that many contracts that were not com-

petitively bid, such as those for items of equipment, paint, and traffic signs, nevertheless contained the requirement of a performance bond and a labor and materialmen's bond, and a retention clause. Even though there may have been no legal requirements for competitive bidding, the inclusion of performance and labor and materialmen's bonds, retention clauses and similar provisions, the fact of the matter is that the commission had made a practice, which it admittedly varied at times, that its contracts be competitively bid, be accompanied by the ordinary bonds, and provide for a retention clause. Defendants attempt to use the lack of any legal requirement of these provisions to justify their action. That was for the jury. In the trial of a case of this nature involving fraud such matters are relevant. This conspiracy to defraud was perpetrated in the negotiation, the obtaining, and the performance of the contract of February 28, 1955. Where advantage is taken of technicalities to perpetrate a fraud, they may not be set up in defense thereof after conviction; a fraudulent conspiracy being shown, defendants cannot now hide behind the fact that these omitted contract provisions were not legal requirements. Defendants' acts and deeds in obtaining the contract, in its execution, and in its performance are relevant considerations in determining the existence of the conspiracy and the nature of the fraud. The peculiar nature of the contract, its disguise, its failure to have the usual provisions, its failure to have been competitively bid under the circumstances, the nature of the work performed under the contract, the price charged therefor were all matters for the consideration of the jury in determining whether this was actually a conspiracy to defraud. See *Com. v. Sanderson*, supra, 40 Pa. Superior Ct. 416, 471, 472.

The subsequent handling of this contract corroborated the Commonwealth's theory. The Manu-Mine

contract was treated as an engineering contract in the negotiations and was adopted by the commission as an engineering contract. Afterwards, in the course of its performance, it was treated as a construction contract. For example, the periodical estimates for payments were submitted on the regular contract form of the commission for construction work and Manu-Mine is referred to therein, in the various certificates, as "contractor." The certificate on each of the periodical estimates signed by Landsidle as general manager of Manu-Mine is to the effect that all of the work has been performed in accordance with the "terms and conditions of the corresponding construction contract documents." Some time after its execution the contract received a number in the sequence of construction contracts, and a standard construction performance bond and a labor and materialmen's bond were requested and dated back to the time of the contract.

We are unable to agree that defendants were harmed by the submission to the jury of the question whether this was a construction contract. Actually if the trial judge had charged as a matter of law that the contract was definitely a construction contract or definitely an engineering contract, as defendants contend should have been done, it would have been error for the trial judge not to have said that this was a construction contract. All the testimony and the circumstances concerning the nature of the work done and the method of handling this contract after it was obtained point unequivocably to the fact that it was a construction contract.

It was not error to submit to the jury the question whether this contract should have been competitively bid. The evidence showed that, with one exception, all of the roadway construction contracts on the Northeastern Extension were competitively bid. It was also demonstrated that with some exceptions other con-

tracts were competitively bid. This was not an invariable practice, but it was generally followed and was a relevant consideration in this case. The jury was not instructed that, if it found that the Manu-Mine contract was a construction contract, it then, as a legal requirement, must have been competitively bid. The trial judge instructed the jury that it was to consider whether it should have been so bid. The failure had bearing on this case in demonstrating the method used by the conspirators to avoid the discovery of their fraud and to avoid the possibility that some other contractor might obtain the drilling contract, particularly since the price charged was shown by the evidence to have been exorbitant. Clearly this was a matter for the jury to consider in determining whether or not these defendants were guilty of the conspiracy to defraud. The awarding of this contract, in view of the general practice of the commission relating to construction contracts, was a significant factor in the scheme devised by defendants.

Defendants complain that the trial judge refused their points for charge relating to the absence of a statutory duty upon the commission to advertise for competitive bidding. It is true that the trial judge refused such a point for charge. However, the jury was charged that the provisions of the State Highway Act relating to the advertising for public bidding did not apply to the Turnpike Commission; that the Northeastern Extension Act specifically authorized the commission to enter into all contracts necessary for the performance of its duties, and that the only limitation on its power was the requirement that construction contracts be approved by the Department of Highways.

The trial judge also charged that the evidence showed that the commission had exercised its discretion in contracting; and that in some instances construction contracts were let on competitive bidding and

in other cases were entered into as a result of negotiation. Under the circumstances it was not error to refuse the point for charge requested. The jury could not have been under the impression, from the charge or the evidence, that there was any statutory duty upon the commission to have its construction contracts competitively bid. The matter was made clear to the jury by the charge of the court and the points of defendants which were read; it needed no further elaboration.

The trial judge refused points of defendants for charge to the effect that the vote of Joseph J. Lawler, in favor of the contract of February 28, 1955, as an ex officio member of the commission by virtue of his office as Secretary of Highways, had the legal effect of giving the approval of the Department of Highways to the contract as required by the statute. Defendants contend that the trial judge erred in refusing thus to submit to the jury the question whether the vote of the Secretary of Highways constituted approval of the Department of Highways to the contract of February 28, 1955. We do not think it was error to refuse this point. The guilt or innocence of these defendants did not depend upon any technical approval given by Lawler when he voted in favor of the contract. The evidence indicated that the Department of Highways maintained at the commission a staff member whose duty it was to examine construction contracts which required approval of the Department of Highways and to give such approval if the contracts were found to be satisfactory. This normal procedure was admittedly not followed in the case of the Manu-Mine contract. The significant factor was not any technical approval by the Secretary of Highways when he voted for the contract but rather the conduct of the defendants in failing to follow the normal procedure for such approval and through the normal channels. Whether the vote of Lawler constituted in the strictest legal

sense the approval of the Department of Highways is a question which need not be decided. See *McIntosh Road Materials Company v. Woolworth,* 365 Pa. 190, 210, 74 A. 2d 384. Even if it did, the defendants could not take refuge behind this technicality when the evidence demonstrated their efforts to avoid approval through the normal channels by the disguise of this contract as an engineering contract, by their failure to have the contract competitively bid, and by their failure to provide the usual protective clauses of construction contracts.

Defendants submitted several points for charge dealing with the nature and effect of opinion evidence. The trial judge affirmed three of the four submitted points on opinion evidence to the effect that opinion evidence is not the same as factual evidence and that the jury is not bound to follow opinion testimony, especially where such testimony is of a contradictory nature. The points left for the jury weight to be given to opinion testimony and the jury was specifically charged that it was not obliged to believe the opinions expressed by experts. One of the points on opinion testimony was not affirmed and defendants cite this as error. The refusal of this point was not prejudicial. The affirmance of the other points submitted by defendants adequately covered the nature, effect, and weight to be given expert testimony and presented the matter clearly to the jury.

Among defendants' complaints is the refusal of the trial judge to affirm a point for charge on the subject of political bias. The defendants had submitted two points on this subject. One the trial judge modified, affirmed, and read to the jury; the other was refused. The point affirmed related to bias, interest, prejudice or animosity of any witness to be considered by the jury in determining credibility. The other point concerned a generalized statement on political bias in the

institution of the proceedings against defendants. Aside from the fact that the point was too general and nebulous, it is clear that the motive for instituting proceedings is not a relevant consideration at the trial except as it bears on credibility. See *Com. ex rel. Flower v. Superintendent of Philadelphia County Prison,* 220 Pa. 401, 409, 69 A. 916. A defendant cannot escape criminal liability, where the evidence indicates guilt, on the basis that the motive of the prosecutor may have been other than the proper administration of justice. The motive may be relevant on the question of credibility of any witness who testifies and the point in this regard requested by defendants was affirmed.

Evans contends that it was error to refuse a series of points which were submitted to the effect that the contract with Manu-Mine could not have been approved without the affirmative vote of the majority of the members of the commission, and that the vote of Evans alone was not sufficient to approve the contract or authorize its execution. It was not reversible error to refuse these points under the circumstances. The evidence had indicated that the contract was negotiated and disguised as an engineering contract, and that at the meeting of February 28, 1955, Manu-Mine was made to appear as a firm of international good reputation; it was also stated at this meeting that this contract and the work thereunder were of immediate importance for the expeditious construction of the turnpike extension. That the contract could not have been approved without the vote of a majority of the members of the commission was unimportant in view of the fact that the contract was in fact approved, and that it was disguised to obtain that approval. The fact that a fraud succeeds and results in action being taken by some innocent parties, such as the members of the commission who were not involved in the fraud, cannot form the

basis for relieving those who are parties to the scheme.

It is alleged that the trial judge erred in refusing points for charge that the contract of February 28, 1955, contained no provision relating to profits; and that the contract was a fixed price contract which could not be converted into a cost plus contract. It is true that the contract did not contain any provision relating to profit and that it provided a fixed unit price of $12.50 per foot for drilling. There was no question in this case, nor was it the contention of the Commonwealth, that this contract contained any provision relating to profits or that the $12.50 per foot of drilling was anything other than a fixed unit price in the contract itself. The issue was, however, the fraud in the negotiation of the contract and the submission by Manu-Mine of a cost analysis prior to execution of the contract which purported to justify the $12.50 per foot price for drilling. The contention of the Commonwealth was, and the evidence in support thereof indicated, that although the contract contained a fixed price of $12.50 per foot this price was obtained by reason of the fraud and the conspiracy. The cost analysis submitted prior to execution of the contract was one of the significant methods of perpetrating the fraud. Since the fraud was in the awarding of the contract and the performance thereof, the circumstances leading to the obtaining of the contract were relevant consideration, not just the provisions appearing in the contract. *Com. v. Sanderson,* supra, 40 Pa. Superior Ct. 416, 471. Consequently it was not error to refuse the requested points.

Stickler contends that it was error to submit to the jury count 22 of the fraudulent pretense indictment which charged him with an attempt to obtain funds from the commission by means of the false pretense. The basis for count 22 of the indictment was the civil suit pending in the Dauphin County Court to collect

the balance of $833,000 allegedly due under the contract. The false pretense related back to the initial analysis of the drilling price submitted by Manu-Mine. The $833,000 was largely a duplication of the amounts involved in counts 18 to 21 of the fraudulent pretense indictment, but it was based on the additional attempt to collect that money by means of the lawsuit after the submission of the periodical estimates. The evidence supported the charge. The witness Summers and defendant Stickler testified that Manu-Mine brought the suit to recover the balance due under the contract. The filing of the civil suit to collect the fruits of a conspiracy has been held to keep alive the conspiracy; it amounts to an attempt to collect the object of the fraud and of the false pretenses which formed the basis of the conspiracy. See *Com. v. Strauss,* supra, 89 Pa. Superior Ct. 82, 92; *Com. v. Girardot,* supra, 107 Pa. Superior Ct. 274, 277, 163 A. 362.

Stickler also contends that the separate sentences on several counts of the fraudulent pretense indictment are unlawful because the evidence allegedly showed only one false pretense. The fraudulent pretense indictment contained 22 counts. The first count charged the obtaining of the contract by reason of the false representation concerning the drilling price analysis; counts 2 to 22, inclusive, charged the obtaining or attempt to obtain funds under the periodical estimates by reason of the false representation on the price breakdown. Stickler says that there was in reality at most one false representation in the submission of the initial cost analysis. He argues that the gist of the offense of fraudulent pretense is the false representation, not the obtaining of the periodical estimates, hence the periodical estimates represent the result of but one crime. We cannot agree with the argument. The crime of fraudulent pretense involves not only the false representation, whether oral, written, or by con-

duct, but also the obtaining of something of value as
a result thereof with intent to defraud. See *Com. v.
Thomas,* 166 Pa. Superior Ct. 214, 216, 70 A. 2d 458;
*Com. v. Prep,* 186 Pa. Superior Ct. 442, 446, 142 A.
2d 460. The evidence in this case indicated that Stick-
ler and Landsidle falsely represented to the commis-
sion and its employes that the price per foot of drill-
ing was a justified one in view of the cost breakdown
submitted to the commission. As a result of that rep-
resentation they obtained not only the contract but
the payment of various sums in the performance there-
of as each periodical estimate was submitted. Each
periodical estimate was a separate obtaining of funds
or an attempt to obtain funds by reason of the false
representation of the drilling price. Each time a pe-
riodical estimate was submitted Manu-Mine received
or attempted to receive additional value and it did so
only because of the original fraud. This is not compa-
rable to those cases in which there is but one criminal
act or transaction as in *Com. v. McCord,* 116 Pa. Supe-
rior Ct. 480, 488, 176 A. 834, and *Com. v. Baker,* 115
Pa. Superior Ct. 183, 188, 175 A. 438.

Torrance contends that the charge of the court
prejudiced him in several respects, particularly con-
cerning his claim of reliance upon the judgment of the
subordinates at the commission in connection with en-
tering into the Manu-Mine contract. The trial judge
fully impressed upon the jury in the charge and by the
points for charge that it was essential to a conviction
of Torrance that he be shown to have acted with crim-
inal intent and with a corrupt motive. The discretion-
ary powers of a commissioner, the presumption that
the discretion was not abused, and the claim of reli-
ance upon subordinates to establish lack of corrupt
motive were adequately covered. A misstatement of
the evidence in the charge relative to the count in the
misbehavior indictment charging obstruction of the in-

vestigation was corrected at the request of defense counsel. The charge of the court as to Torrance was not unfair, improper, or inadequate.

Defendants argue that the charge of the court as a whole was basically erroneous in that it did not clarify the issues for the jury and because it unduly emphasized and magnified the claims and evidence of the Commonwealth and minimized those of the defense. The trial judge must maintain impartiality; he should not in his charge overemphasize the claims and contentions of one side while minimizing the claims and contentions of the other. *Com. v. Bartell*, supra, 184 Pa. Superior Ct. 528, 546, 136 A. 2d 166. One of the primary objects of a charge is to clarify the issues so that the jury may properly comprehend the questions they are to decide. *Com. v. Milligan*, 172 Pa. Superior Ct. 607, 609, 94 A. 2d 64. We have examined the charge as a whole and find that it is not of the nature alleged by defendants. The charge including the points for charge covers approximately 200 pages in the printed record. Briefly the nature of the charge and matters covered were as follows: After introductory remarks the trial judge extensively discussed the question of credibility, the burden of proof upon the Commonwealth, the presumption of innocence, the nature of circumstantial evidence and the quantity and quality thereof necessary for conviction, the nature and legal requirements concerning conspiracy in general, and the individual indictments together with definitions of the crimes charged therein and references to the statutes applicable thereto. The nature and necessary elements of the crime of fraudulent pretense were explained. The discretionary powers of the commissioners were discussed; it was stressed to the jury that a corrupt and willful design was necessary to convict, and that an honest mistake of judgment or exercise of discretion was not sufficient. The nature and eviden-

tiary weight of reputation evidence was given to the jury. The trial judge commented upon essential questions and issues to be considered by the jury and in so doing fairly presented the contentions of both sides. He gave a brief summary of the testimony of the witnesses, and in this respect it is to be noted that in discussing the Commonwealth witnesses the court's charge covered approximately ten pages as compared with approximately thirty-three pages devoted to the discussion of the defense witnesses. Interpolated in the recital of the testimony of the witnesses were questions raised by the testimony with a presentation of the contentions and interpretations of the Commonwealth and the defense as to that testimony. The evidence pertaining to several of the defendants with the contentions and interpretations of both sides were discussed. The exhibits were considered. The trial judge reiterated that a mistake of judgment on the part of the commissioners would not be sufficient to convict them of misbehavior in office. Time and again both sides of each question were raised and were discussed. The trial judge then finally considered the points for charge submitted by defendants, and the points affirmed cover approximately thirty-two printed pages. A review of the charge indicates that it was fair and complete. In fact much of the evidence of the Commonwealth was not stressed to the permissible limits. The contentions of defendants relative to the charge of the court as a whole are without merit.

IV. Conduct of the Trial

Defendants make a comprehensive attack upon the fairness of the entire proceedings from the investigating grand jury to the time of sentence. The asserted denial of due process must be tested by an appraisal of the totality of the facts in a given case. *Betts v. Brady,* 316 U. S. 455, 461, 462, 62 S. Ct. 1252, 86 L. Ed. 1595, 1601, 1602. In this portion of the argument

defendants raise several of the specific items previously considered such as the speech and remarks of the Governor,[17] the alleged intrusion upon the grand jury, the refusal of the bill of particulars and similar matters. To these they add others. We have discussed several of these specific matters separately in this opinion, and, giving further consideration thereto in the totality of the facts surrounding the prosecution, we come to no other conclusion than that due process was not violated. A reading of the entire record discloses no basic unfairness, bias, or prejudice in the admission or restriction of evidence, the examination and cross-examination of witnesses, or the attitude of the court toward defendants. The attitude of the trial judge in his rulings, in permitting the presentation of evidence, in the cross-examination of witnesses, as it can be gathered from the printed record, was equally fair to both sides. We point specifically to the wide latitude permitted defense counsel in cross-examining such witnesses as Lawler and Summers. We note that each of the counsel for the nine defendants on trial were given full and separate opportunity to cross-examine witnesses and present evidence. Defense counsel were also permitted to cross-examine the defendant Torrance and to elicit from him by leading questions much favorable evidence. Certainly in a trial of this nature and length there may be some errors of minor consequence; we find no reversible error. That the jury reached its conclusion without bias or prejudice from the conduct of the trial is indicated in some degree by the fact

[17] Although the remarks of the Governor were said to have been widely disseminated in Dauphin County by television and radio, the effect of these remarks upon the trial jury has not been raised with particularity by the usual methods, such as a motion for change of venue, a challenge to the array, or by individual challenges for cause during selection of the petit jurors on voir dire.

that four of the defendants in this joint trial were acquitted. See *Com. v. Dixon,* supra, 179 Pa. Superior Ct. 1, 6, 115 A. 2d 811; *Com. v. McHugh,* supra, 187 Pa. Superior Ct. 568, 574, 145 A. 2d 896. The myriad minor items enumerated in the briefs of defendants in connection with the attack upon the over-all conduct of the proceedings neither singly nor collectively demonstrate any basic unfairness.

We have considered all contentions which defendants have presented in 1,400 pages of brief; and we have answered at length those which are in any way worthy of extended comment.

We conclude this opinion by referring to one other allegation of the defendants to the effect that the trial judge was biased and unfair. This is devoid of merit. As a matter of fact, under the circumstances he displayed unusual self-control and forbearance. There were lengthy and repetitious objections by fourteen defense counsel during the trial, and at its conclusion, in support of their motions, they assigned 941 reasons and 221 additional reasons incorporated by reference. In the record of 6,500 pages we find no justification for the criticisms by defendants of the conduct of the trial judge. It is our conclusion that defendants had a fair and impartial trial, and that there was no violation of due process of law.

The conviction of James F. Torrance on count 3 of the indictment charging him with misbehavior in office (No. 220, January Sessions, 1957) is reversed.

The judgment of sentence as to Paul J. McNeill on indictment charging conspiracy (No. 216, January Sessions, 1957) is reversed and said defendant discharged.

The judgments of sentence otherwise as to Thomas J. Evans, James F. Torrance, Charles W. Stickler, and Clayton A. Landsidle are affirmed, and it is ordered that said defendants appear in the court below at such time as they may be there called, and that they

be by that court committed until they have complied with their sentences or any part thereof which had not been performed at the time the appeals were made a supersedeas.

GUNTHER, J., would grant the motions to quash the indictments and discharge the defendants.

———

OPINION BY WOODSIDE, J., CONCURRING IN PART AND DISSENTING IN PART:

I concur with the majority in the discharge of McNeill, the arrest of judgment on the one count against Torrance, the sustaining of the indictments and the refusal to arrest the judgments in the cases of Evans, Stickler and Landsidle.

I dissent in that I would arrest the judgment on the other charges against Torrance, and I would grant a new trial to Evans on all indictments, and to Stickler and Landsidle on the conspiracy indictment.

### Arrest of Judgment

When the net is cast widely, as in a grand jury investigation, it is likely to envelop some who do not deserve the fate. Of the nine persons indicted in this case, the trial jury acquitted four and convicted five. We are discharging one of the five. In my opinion, another of the appellants should be discharged because the evidence against him is insufficient to support the charges. In a trial as long and as involved as this one, it is difficult to keep each phase of the case in proper perspective.

Acknowledging the dangers of an oversimplification by condensing over 5000 pages of testimony into a half dozen pages, I shall attempt to get to the heart of the offenses for which the appellants have been sentenced, and to examine the connection of one of them with the

wrong done the Commonwealth. In doing so, we uncover an injustice which should be corrected.

Examining the evidence in the light most favorable to the Commonwealth, we find that on February 28, 1955, the Pennsylvania Turnpike Commission entered into a contract with Manu-Mine Research and Development Company.

Stickler, Landsidle, T. J. Evans and Torrance stand convicted of conspiracy to cheat and defraud the Commonwealth through this contract. The evidence establishes that Stickler (a nephew of Mrs. T. J. Evans) as president and Landsidle as general manager of Manu-Mine obtained this contract through false pretense, and cheated and defrauded the commission by virtue of it. They, along with Richard Evans, now deceased, son of defendant T. J. Evans, shared handsomely in the approximate $4,000,000 profit which Manu-Mine made from the contract.

All five members of the commission voted to approve the contract. In retrospect, it seems as though all of them should have recognized that such action was contrary to the best interests of the commission. It must be said in their defense, however, that the contract was recommended to them by the commission engineers, the consulting engineers, the commission counsel and other commission officers and employees who had negotiated, prepared or examined the contract and were familiar with the work to be done. Public officials must frequently rely upon their deputies and assistants. They cannot be held criminally responsible for the negligent or criminal acts of their deputies and assistants under circumstances such as this.

Of the five commissioners, Evans and Torrance alone were indicted, tried and convicted. Evans was chairman of the commission, and member with longest service, and, according to the Commonwealth's contention, the dominating influence on the commission. His

relationship with Manu-Mine is apparent. Torrance had no connection, directly or indirectly, with the company.

To prove a criminal conspiracy the evidence must rise above mere suspicion or possibility of guilty collusion. *Commonwealth v. Burdell,* 380 Pa. 43, 49, 110 A. 2d 193 (1955).

A conspiracy involves an agreement. *Commonwealth v. Rosen,* 141 Pa. Superior Ct. 272, 279, 14 A. 2d 833 (1940). See Act of June 24, 1939, P. L. 872, §302, 18 PS §4302. The agreement need not be formed by express words, but may be inferred from concerted action. *Commonwealth v. Antico,* 146 Pa. Superior Ct. 293, 22 A. 2d 204 (1941); *Commonwealth v. Horvath,* 187 Pa. Superior Ct. 206, 144 A. 2d 489 (1958).

The indictment charges that the defendants "agreed among themselves to cheat and defraud . . ." Was Torrance a party to this agreement? There is no direct evidence that he was. Only by inferring it from the circumstances can we find that he was a party to it. Guilt must be proved, not conjectured. There must be a reasonable inference of guilt based on facts and conditions proved. A conviction can not rest solely on suspicion or surmise. *Commonwealth v. Bausewine,* 354 Pa. 35, 41, 46 A. 2d 491 (1946).

What are the circumstances to which the Commonwealth and the majority of this Court point as establishing that Torrance was a part of this unlawful *agreement* to defraud the Commonwealth?

First, he "attended the January 1955 meeting at the Hotel Sterling in Wilkes-Barre." Evans, Torrance, Paul, Cleaves, and other officers and employes of the Turnpike were in Wilkes-Barre to examine the location of the Wyoming Interchange. The trip was publicized and newspaper men were present. It became relevant to this case only because while at the Sterling Hotel, Evans berated Cleaves for giving the newspapers a story that Manu-Mine would get a contract for slush-

ing, and told Cleaves that he was supposed to see that "Manu-Mine didn't get into any problems like this." The conversation was evidence against Evans, but not against Torrance who was not involved in it and had no connection with it. There is nothing in the testimony from which it can be inferred that. Torrance was in any way associated with anything improper in Wilkes-Barre.

Second, Torrance voted to approve the contract; but so did the other commissioners, whom the Commonwealth did not charge with any misconduct and who the Commonwealth admits were misled. If this was evidence that Torrance was a party to the conspiracy, it was evidence that all the other commissioners were parties to the conspiracy, yet no person contends that they all were.

Third, they conclude that at the commission meeting of February 28, 1955, Torrance "urged" the adoption of the Manu-Mine contract, and said that Manu-Mine had an international reputation. Whether Manu-Mine had an international reputation or not is a collateral issue not worthy of mention here, except to note that it becomes a serious matter if the extent of Manu-Mine's reputation is to be the basis upon which a 70 year old public official with prior excellent reputation is to be imprisoned. But what did *Torrance* say about this contract? Secretary of Highways Lawler, explaining his vote for the contract, testified what "they" said, at the meeting of February 28, 1955, but never specified a single statement as having been made by Torrance.[1]

---

[1] This was his testimony: "Q. At that meeting that you have just discussed as taking place on February 28, 1955, was there any discussion of a contract between the Pennsylvania Turnpike Commission and Manu-Mine Research and Development Company? A. There was. Q. Will you tell us who discussed the contract, what it consisted of, that is, the discussion? A. First *they* took up the importance of approving this contract because *they* were faced with

Present at the meeting were five commissioners, staff engineers, consulting engineers, commission counsel and others. Lawler's testimony was: "Q. Did other members talk to you about this contract? A. No sir." It cannot be inferred from Lawler's testimony that *Torrance* "urged" the adoption of the contract, and it is upon Lawler's testimony alone that the Commonwealth relies to establish that he did.

---

the completion of the construction of the Northeastern Extension as far as the payment of interest on bonds was concerned. Q. Who was discussing it? A. The various members of the Commission: Mr. Torrance *or* Mr. Evans *and others.* Q. What happened, if anything? A. *They* said we were faced with paying interest; unless we could get the job completed. Therefore, it was to the best interest of the Commission that we would approve this contract. Q. Was anything done about it? A. Yes—well, before the motion was made to approve the contract, it was pointed out to me, as a member of that Commission, that the Manu-Mine Corporation has an international reputation, it was an outstanding firm; *they* impressed upon me that it was the only firm in existence at this time that was qualified to do that type of work. Mr. Burch: If the Court pleases, I ask that that answer be stricken on the basis that he was referring to people as 'they' without identifying who said what throughout this answer. Mr. Dowling: The next question is: Who made the statement? The Court: Unless the identity of 'they' is established we will have to sustain the objection, I understand the District Attorney to say that he proposes to establish the identity of 'they' by his next question. By Mr. Dowling: Q. Who made the statement that you have referred to? A. *I would say* Mr. Torrance, Mr. Evans, the chief construction engineer, Mr. Paul. Q. What was done pursuant to that discussion; what happened after this discussion, if anything? A. Well, after the discussion took place, it was moved by Mr. McSorley, and I don't know who seconded the motion that the contract be approved." (Emphasis ours) Furthermore, in cross-examination Lawler was asked "Who do you specifically remember participating in the discussion" to which he failed to answer responsively and the Court admonished "we direct you to answer the question as to who participated in the discussion—that is the heart of the question—if you remember." Lawler answered "I don't remember too much of a discussion."

But suppose Torrance did urge the adoption of the contract. The investigating grand jury, or the trial jury, or this Court concluded that numerous people, including at least three of the commissioners, and five employes, among them engineers and a lawyer, made honest mistakes and were misled into approving the contract. There is every reason to conclude that Torrance, too, was misled. An official act of a public official is presumed to have been performed in accordance with the law and in good faith and with the proper motive. *Matson v. Margiotti,* 371 Pa. 188, 88 A. 2d 892 (1952) ; *Commonwealth v. McSorley,* 189 Pa. Superior Ct. 223, 150 A. 2d 570 (1959). How can an act itself presumed to have been done in good faith, be the basis of an inference that it was done with corrupt motive?

This brings us to the only evidence which, at first blush, throws suspicion upon Torrance. He accepted a gift from Stickler, and accepted work on his farm by Manu-Mine for which he did not pay. This conduct demands careful scrutiny.

On December 21, 1954, Torrance received from Stickler a gift certificate which he used on May 5, 1955, along with some of his own money to purchase a suit of clothes. The Commonwealth argues that from this it is to be inferred that he was a co-conspirator with Stickler, Landsidle and Evans in defrauding the commission of millions of dollars. Of course, he is not guilty if he did not conspire, whether the acceptance of the gift certificate for Christmas was ethical or not.

If the facts are consistent with the defendant's innocence, and can reasonably be explained on a theory other than that of guilt, the Commonwealth has not overcome the presumption of the defendant's innocence. *Commonwealth v. Bausewine,* supra, 354 Pa. 35, 40, 46 A. 2d 491 (1946).

It is evident, if one stops to think about it, that the logical inference to be drawn from Torrance's use of

the gift certificate is that he was *not* involved in the conspiracy. If he was a party to a conspiracy to defraud the commission of *millions* of dollars, would he have accepted a suit of clothes as his share of the spoils of the conspiracy? If he was even suspicious that a conspiracy existed or that a fraud was contemplated, would he, in the light of his age, reputation and experience, have permitted the finger of suspicion to be pointed to him for the sake of a suit of clothes? The only reasonable inference which can be drawn from his acceptance of the gift certificate is that he knew nothing of the conspiracy and the fraud. It would be illogical to infer from his use of the certificate that he was a party to a conspiracy to defraud the commission of millions of dollars.[2]

Innocent acts create suspicion, when one becomes involved with unsuspected conspirators. Torrance is a farmer. He built a trench silo in an old quarry on his farm at a cost of approximately $500. While attending the Farm Show, he was discussing this with Stickler who had an exhibit at the show. Stickler asked Torrance to permit him to insert in the silo, then already built and ready for use, a type of wall which Manu-Mine hoped to market for silos. Torrance agreed, and Manu-Mine inserted the wall. Torrance invited photographers and newspaper men to his farm to see the work which had been done by Manu-Mine. They took pictures of the silo, and described the new wall naming Manu-Mine as the builder. These pictures and news articles were published in national farm journals, newspapers and magazines. It cannot reasonably be inferred from this that Torrance agreed with Stickler to defraud the commission. If the work that Manu-Mine performed on Torrance's farm was related to the

---

[2] One of the engineers who was acquitted received a television set as a Christmas present from Stickler in 1954.

conspiracy, Torrance would not have called in the press to publicize his connection with a company whose officers were conspiring to defraud the commission of millions of· dollars. Instead of being evidence of his complicity in the conspiracy, it is evident. that he was not a·party to it. If he had *any* suspicion that a conspiracy existed involving Manu-Mine, or that its officers were defrauding the commission, he would not have permitted its employes to work on his farm, let alone advertise the fact in national publications that they were there doing work on his property.

' ··Torrance did not know that Richard Evans was an officer in Manu-Mine and held stock in the company. The Manu-Mine contract was recommended by the commission's engineers, and the consulting engineers. It was approved by the commission's lawyer. Payments under it were approved by the commission's comptroller. Commission inspectors approved the work. *Ten months after the February 28, 1955 contract was made, 14 different people were approving payments up to $900,000 each under the contract.* Of these Torrance alone has been indicted, convicted and sentenced. What possible ground can there be to conclude that Torrance was guilty of criminal conduct thereby, while the other 13 were not? The engineers, the inspectors, the lawyers, the comptrollers, the accountants, the new chairman who visited the scene of the work, the Secretary of Highways who had a full time liaison employe at the commission office and a staff of engineers, lawyers and investigators at his command—for 10 months, none of them suspected a conspiracy or a fraud, or if any did, he said nothing about it. Because *Torrance* did nothing, is it to be inferred that he, out of all these, is alone criminally responsible for the fraud? The commission continued to operate under the contract, without any of the commissioners discovering the fraud for almost a year. If the fraud was so well designed that it mis-

led the professional men who dealt with it, and on whom the commissioners relied, may we not infer it misled Torrance? It misled the businessmen on the commission. There is no justification in assuming that it did not mislead Torrance, also. *All the evidence indicates that he knew nothing of the conspiracy, and had no connection with the fraud.* It seems, of course, as we look at it today, that the commissioners and many of their employes should have been suspicious of the contract and should have detected the fraud sooner, but that is a fault of all the commissioners, and many of their employes, but not a criminal act of Torrance.

The majority has arrested the judgment of sentence, I think properly, on one of the indictments against Torrance. In my opinion the judgments of sentence against Torrance in the other two indictments should also be arrested.

If we look further, however, we shall find that the injustice to Torrance did not stop with his conviction, but was carried into his sentences. Even those who may disagree as to his innocence on these charges, must agree that any part which he *could* have had in the conspiracy and fraud had to be *far less* active and *far less* rewarding than that of the other three who stand convicted of conspiracy. Torrance received a sentence of 2 to 4 years in jail; Landsidle received a sentence 1 year 10 months to 3 years 11 months; Evans received a flat sentence of 2 years and a consecutive sentence of 1 to 2 years, and Stickler received a flat sentence of 5 years. The Board of Parole can release Landsidle after 1 year and 10 months, Evans after 1 year and 1 day and Stickler after 1 day, but Torrance cannot be released from prison until after he has served 2 years. Thus Torrance faces the longest minimum sentence of any. The courts and the law look upon the maximum as "the" sentence, but those who serve them always look

upon the time which the court says they *must* serve as "the" sentence.

There were a score or more of people who through culpability, negligence, or mistaken judgment permitted the fraud to be perpetrated. Under no possible view of the case could Torrance be classified as the most culpable or even the most negligent, but he will be the last of all of them permitted to seek a parole unless the Board of Pardons or the appellate courts decide otherwise.

I think the evidence was insufficient to sustain the conviction of Torrance, and I would discharge him.

### New Trial.

We all agree that it was error to have witnesses read statutes of the Commonwealth to the jury.[3] The majority excuses the error on the ground it was not prejudicial. Ordinarily, it would not be prejudicial for a witness to read to the jury a statute, which the trial judge might properly read to it in his charge. But, the law relating to the Highway Department which was read to the jury by a witness in this case differs from the law relating to the Turnpike Commission which was applicable to the procedure here in question. I agree, therefore, with Judge WATKINS that it was not only glaring error to have the statute read by a witness but that doing so must have misled and confused the jury and was prejudicial to those defendants who were former Turnpike Commissioners or officers.

Furthermore, I agree with what Judge WATKINS said concerning the testimony which Paul gave before the grand jury. We all agree that Paul's grand jury testimony was not admissible against any of the appellants. The question here is whether the jury used this

---

[3] Even the Commonwealth does not cite a single authority to support this action.

testimony to the prejudice of the appellants. We start
with the presumption that it did not, because the trial
judge told it not to. But, as I see it, this is a presump-
tion which circumstances can rebut, and the use of this
testimony throughout the proceedings by both *the trial
court and the Commonwealth,* overcomes the presump-
tion that *the jury* did not use it against the appellants.

Upon the acquittal of Paul this testimony was com-
pletely out of the case. It should not thereafter have
been mentioned by court or counsel except to determine
whether it sufficiently prejudiced the case of the other
defendants to warrant granting them a new trial.

To emphasize how impossible it was for the jury to
follow the court's instruction not to use this testimony,
we need only note that the court itself in its opinion
used over 700 words to review Paul's testimony while
stating the facts upon which it relied to sustain the
conviction of the appellants. Even in the argument be-
fore this Court, the district attorney made extensive
use of Paul's grand jury testimony to support the con-
viction of the appellants, particularly Evans. If the
judge and the district attorney continue to use Paul's
testimony to determine and argue the guilt of the ap-
pellants, it is conclusive proof to me that Paul's testi-
mony could not possibly have been ignored by the jury
in passing upon the appellants' guilt.

The evil of the use of this testimony against the ap-
pellants is that (1) they had no opportunity to cross-
examine their accuser; (2) they had no opportunity to
contradict in rebuttal what was said about them; (3)
they had no opportunity to object to and prevent the
use of hearsay and other incompetent testimony given
by Paul to the grand jury. The unfairness of this is so
glaring and so basic that it requires the granting of a
new trial. At a new trial, Paul could be called as a
Commonwealth witness and could testify to the facts
contained in his testimony before the grand jury so far

as they are relevant to the appellants' cases. The defendants would then have the right to cross-examine him and to rebut any untruthful testimony and to have the trial judge limit the testimony to that which is competent. This would give the appellants the fair trial to which they are entitled, and enable the Commonwealth to obtain the conviction of those whom the evidence would show to be guilty.

As I view it, Paul's testimony and the reading of the statutes prejudiced Evans to a *much* greater degree than it prejudiced Stickler and Landsidle. The statute misled the jury as to the duties of the Turnpike Commission of which Evans was Chairman. Paul's testimony was directly concerned with excusing any misconduct on his part by placing the blame on Evans. I would, therefore, grant Evans a new trial on all charges, and Stickler and Landsidle a new trial on the conspiracy indictment.

———

DISSENTING OPINION BY WATKINS, J.:

I must respectfully dissent.

I have noted the great lengths to which Courts, and particularly appellate Courts, properly go to protect the rights of defendants, even though they be hardened, habitual criminals. It seems to me that, at least, the same concern should be exercised when the defendants happen to be men of prior sterling character who have enjoyed outstanding reputations in this Commonwealth. This should be especially true when the charges involved are grounded in politics, and by their very nature, invite the glare of publicity that tends to arouse adverse public opinion. We should always abhor trial by newspaper, radio and television.

The special Grand Jury was called upon a petition by the Attorney General of the Commonwealth, in

which the District Attorney of Dauphin County had joined, on October 22, 1956. The purpose was to impartially investigate irregularities that were alleged to have taken place in the administration of the Pennsylvania Turnpike Commission as set forth in the petition.

We must remember that the Attorney General is the appointive officer of the Governor, serving at his pleasure, therefore subject to his supervision and control. At the very time the hearings began and immediately thereafter, the Governor of the Commonwealth made certain public statements, excerpts of which are set forth in my concurring opinion in *Com. v. McSorley,* 189 Pa. Superior Ct. 223, 150 A. 2d 570 (1959), at page 240, and which I repeat again in a footnote to this opinion.[1] These statements by the Governor were given

---

[1] Speech of October 22, 1956 made in television broadcast:

"You've seen the headlines—you'll see more. Investigation meanwhile goes on. The latest example of how the Republican leaders did business is the Turnpike scandal. A special Grand Jury is now investigating this development. We're proud of our Turnpike, justifiably so. It's one of the great highways of the world. And we have a right to be angry that anyone would use it to swindle. Yet this has been done. Certain people set out to steal $20,000,000 from it and they got $9,000,000 before we could stop them. Their front was a company called Manu-Mine Research and Development. Their officers were close relatives of the Chairman of the Republican Turnpike Commission—his son, his nephew and his niece by marriage. Together they owned almost all the stock in the Company. Now how did they go about getting this $9,000,000 from us.

"It was really very easy. Without competitive bidding they got a job digging holes in the ground and then filling them up again. Experts found these holes were useless and the prices charged for digging them and filling them were outrageous.

"As soon as we found out about this our Democratic Commissioners asked the Attorney General to investigate the matter. And Attorney General Cohen petitioned for a Grand Jury investigation. The investigation is now taking place.

extensive and repeated coverage by the press, radio and television. The comments made in that concurring opin-

---

"Now let's go back for a moment to examine exactly how Manu-Mine and its officers who knew the right Republican leaders, pulled off this swindle.

"Manu-Mine set up shop modestly with a nominal capital of $4,300 and as I told you before we stopped the deal, it had been paid over $9,000,000 by the Turnpike Commission. The secret of its success as we've seen was simple—Manu-Mine had an inside track with the Turnpike Commission and as a result it did 96.8% of its business with the Turnpike. Now, on most jobs like this one that Manu-Mine worked on, you have competitive bidding. Manu-Mine never had to bid against anybody, it never had to negotiate,. it was employed as a consultant. As a consultant it recommended itself as contractor and then as an inspector of its work that it performed.

"I have here a report by Manu-Mine and the Turnpike Commission. This report cost us $117,000,000 and the gist of it was to propose a contract with—you guessed it—Manu-Mine. Now about that job. Experts say that it was unnecessary. It was made work and the price was jacked up sky-high. Now this isn't what I say or what anyone in my administration says—this is in the impartial report by the Pierce Management Company of Scranton.

"Here is the report and here is what it says:

" 'In our calculations as to the reasonable unit price for drilling, we approached it from two view points. One, assumed contractor-controlled equipment. Two, assumed contractor-rented equipment. In both cases, basing the volume of drilling upon the original estimates, we allowed for overhead, a reasonable profit and the cost of casing.

 With contractor-owned equipment we estimated a reasonable unit price to be $4.77 per linear foot. With rented equipment, we estimated a reasonable unit price to be $5.95 per linear foot.'

"Manu-Mine was paid $12.50 per linear foot. Now you know the story. As much of it as we know of it. You'll know more when the Grand Jury reports its finding. But the important thing to remember is this is no isolated case: that the Republican leaders have an unfortunate history of scandal that is now coming out after years of being covered up. We've only scratched the surface. We will not stop until we have made sure that the guilty have been found out and brought to justice. But more than that we will introduce a Legislative program in Harrisburg which will see to it that such

ion concerning the prejudice. created by the statements of the Governor as to the defendant McSorley, apply

dishonest and improper practices can never happen again and that's why I ask you to vote for a Democratic House of Representatives and a Democratic Senate in Harrisburg this fall so that we can pass the legislation needed to prevent dishonesty in your State Government . . ."

Statements of October 23, 1956 made in television broadcast:

Don Wear: "John Scotzin would you begin questioning Governor Leader tonight."

John Scotzin: "Governor, I caught you on a television program last night. I'm not sure what station it was—it may have been this one. It was a tailend of a political film in which you renewed all your charges about Manu-Mines of Reading fleecing the Turnpike Commission of more than $9,000,000 under Republican control. The film reminded me of a statement you made early last September when you sent Attorney General Cohen in the Dauphin County Court to ask for a Grand Jury investigation of these charges. At that time you said you were sorry to break these charges on the eve of a political campaign and that you said this wasn't a matter concerning Republicans or Democrats, that all you wanted to do was get the truth. Obviously you're out to make political hay in a film like you had last night. Now how do you reconcile these two divergent statements?"

Governor Leader: "Well, I think the people, John, are entitled to know the facts. And when there is conspiracy or at least an alleged conspiracy in Pennsylvania, that some group full of wilful politicians are trying to lift from the Turnpike Commission more than $9,000,000, I think the people of this State have a right to know the facts. We're laying those facts before them and I think it's one of the things that—I guess almost everything, in spite of the fact that we sometimes try, I think almost everything that an official or governmental official does can be looked upon as politics and I believe that the people ought to know the facts in this case. There are a lot of people involved and we've laid the facts before them as ably as we can. But certainly there's a great deal more to this than I've laid before them in that television film and I think that the people of this state are going to be completely and thoroughly shocked at what happened. The moral tone and the ethical standards of this government as exemplified by what happened down there at the Turnpike Commission when they get the results of the Grand Jury that is now convened here in Dauphin County."

with greater force to the defendants herein because of the special reference made to them by the Governor.

---

Don Wear: "Go ahead John."

John Scotzin: "Governor, your statements at this instance, plus your film raised a question in my mind that in view of the fact that the Dauphin County Court turned over this matter to the Grand Jury yesterday. Is there any question of this case being prejudged in your mind or influencing the Jurors who are considering it right now? They go home and listen to television Governor."

Governor Leader: "No, I don't think there is any danger."

John Scotzin: "No?"

Governor Leader: "Because the information that we put in there is already common knowledge, has already been published all over the State in newspapers. We haven't given any of the penetrating, the depth of information that are being presented to the Grand Jury. This is just superficial compared to the things that will be forthcoming, it seems to me, to the Grand Jury. We have been very cautious. There's a great body of information that we have at our finger-tips obviously or we would not have asked for this investigating Grand Jury here under, incidentally, a Republican District Attorney in Dauphin County. We would not have asked for it if we did not have a great body of information. What we have said so far we have merely scratched the surface but I do believe the people of this Commonwealth are entitled to the information and ought to know the facts."

John Scotzin: "But my point, Governor, is, when you keep renewing your charges they are bound to have some influence on these jurors who are analyzing this evidence. Let me give an illustration. What if I went out and interviewed a hundred people downtown and I published the results of what they thought about this case. Say some of these decided Manu-Mines was guilty and some of these decided they were not guilty."

Governor Leader: "They wouldn't have the facts John. The facts that have been presented so far have been very limited. It's up to the Grand Jury to determine whether or not they are guilty but the superficial facts that we presented there are just the beginning. There's no doubt that we haven't backed them up with all the great, vast body of information that has been collected over the past six or nine months and that's the information that's now being presented to the Grand Jury. I have more faith in those members that they're going to judge the cases either on the basis of what

We think it is important enough to repeat what we said in *Com. v. McSorley*, supra, at page 240:

"An examination of the speeches delivered by the Governor on the eve of convening the Grand Jury and the following evening disclose a disturbing interference with orderly judicial process. The speeches themselves

---

they've read in your newspaper or what they've seen in my telecast."

John Scotzin: "One more question."

Don Wear: "Go ahead, John."

John Scotzin: "If I publish those facts that I found in the poll, I think that the Dauphin County Court would take a dim view of me and probably call me in and reprimand me for that on the basis that it may be prejudicial."

Governor Leader: "Well, I don't think—I don't think they're going to be influenced that easy. If I didn't believe that the great body of information we have was enough to—ah—it makes a few things that you said in your papers and that I said in that telecast look ah—small because we have only scratched the surface. It's all superficial. The real case is being presented down there, I'm sure. is being presented ably and well by one of the former Assistant District Attorneys of the City of Philadelphia. There is great and vast body of information and research and investigation and facts backing up that case and I have great confidence in the way it's being presented and the ability of the Grand Jury to interpret it and to come to a logical decision."

John Scotzin: "Governor, conceivably the inquiring Grand Jury could determine that you have no case and throw it out and then nobody is going to be indicted?"

Governor Leader: "Well, yes it's conceivable."

John Scotzin: "The judge in his charge to the jury told them there should be no presumptions of the guilt or innocence of anybody in these proceedings."

Governor Leader: "I guess that's the way they all start and that's the way law—the tradition of our law and justice in this country is said. And I think it will be interesting to see the developments in that Grand Jury and also be interesting to watch the developments in the Delaware Joint Toll Bridge investigation where there was also a lot of money being spent, extravagances and where they had Miss TNT from Gay Paree on the payroll as a part time secretary."

indicate without any doubt the telling effect it had upon those who heard or saw the program. Excerpts from these speeches are set out in a footnote hereto.[1] The stations carrying these programs admittedly had a wide coverage of Harrisburg and Dauphin County and were heard and viewed by large numbers of residents of the area. The statements of the Governor were quoted repeatedly by the daily press, radio and television. It would be a tenuous assumption to state that members of the investigating Grand Jury or prospective members of the indicting Grand Jury and petit jury did not hear or see these broadcasts. While the court below stated that it had no reason to believe that the Grand Jury disregarded the admonitions relative to political speeches, it can be safely said that the indicting Grand Jury or the trial jury did not have the benefit of the court's admonition. Coming, as it did, from the Governor himself, the speeches undoubtedly had a forceful and prejudicial effect which tainted the proceedings. And while we do not ascribe any evil motive to the Governor in making these speeches at this time, we do say that they had a judicially undesirable effect when consideration of fairness and due process are involved and when the unbiased deliberations of an investigating Grand Jury were of utmost importance.

"We believe that the irregularities referred to interfere with the substantial rights of the accused. Under the circumstances here presented, we cannot subscribe to the contention of the Commonwealth that these irregularities were cured by the action of the indicting Grand Jury because it had actual information before it, which information was placed in the presentment. Nor is it much solace to state that the use of the minutes of the Grand Jury was improper. We cannot say that it was."

I think it is important to emphasize a question asked of the Governor by a reporter concerning his state-

ments, as follows: Q. "Governor, your statements at this instance, plus your film raised a question in my mind that in view of the fact that the Dauphin County Court turned over this matter to the Grand Jury yesterday. Is there any question of this case being prejudged in your mind or influencing the jurors who are considering it right now? They go home and listen to television Governor." Even this reporter, without legal or judicial training, realized the danger created by the Governor's statements. His prejudgment of the guilt of all the defendants could not help but permeate the entire jury proceedings and make an unbiased investigation and unbiased deliberations impossible, because of the fact that he was the Governor and the Attorney General his appointee.

Because of all the irregularities in the Grand Jury proceedings, as discussed in detail in *Com. v. McSorley,* supra, I say again as regards these defendants: The motion to quash the presentment should have been granted under these circumstances. Failing so to do, the indictment should have fared no better. Cf. *Commonwealth v. Gross,* 172 Pa. Superior Ct. 85, 92 A. 2d 251 (1952). The factors here involved make out a clear case detrimental to the substantial rights of the defendants.

The majority, in order to create a foundation for the present conviction, has outlined the beginning and development of Manu-Mine, and by this, attempts to indicate it was a favorite of the Turnpike Commission. However, this is completely irrelevant to the issue since all previous contracts were executed and the work was done by Manu-Mine in an excellent manner and for very reasonable prices. This is admitted by the Commonwealth.

The contract entered into February 28, 1955, being the sole basis for these proceedings, that is, the support for the turnpike where it crossed the coal measures, was a matter of concern to the Turnpike Commission and

its engineers for quite some time prior to the negotiation of the above contract, as the record clearly indicates; and was not something dreamed up on the spur of the moment as is indicated by the majority opinion. The Turnpike Commission has always adhered to the rule of maximum safety on all its turnpikes or their extensions. All of the engineers who testified agree that a slushing program to fill existing voids was necessary. The turnpike engineers and consulting engineers to the Turnpike Commission desired to achieve maximum safety. The mining engineers who expressed an opinion that 90% of the program as carried out was not necessary, adhered to the theory of taking a calculated risk on future subsidence on some areas on the Northeast extension. This indicates a difference of opinion among the engineers, and the election by the Commission to adhere to a standard they have followed for a long time would not thereby make them criminally responsible. The maximum safety rule as opposed to the calculated risk rule is practically demonstrated by the recommendation of Michael Baker & Co., successor to Greiner & Co., as consulting engineers to the Turnpike Commission, that flexible pavement rather than concrete be used on sections not flushed and having a propensity for subsidence, and the present unsafe condition for high speed travel of that portion paved with macadam corroborates the decision of the Commission for maximum safety.

I have lived in the anthracite mining region all my life and have personal knowledge of the problem of subsidence and how it affects the built-up areas and highways of the region. We have become accustomed to macadam highways that remind you of roller coasters and are always alerted to the danger of subsidence potholes. This we have come to accept as concomitant to the mining industry.

As a member of the Senate I served on the Anthracite Subsidence Commission of 1941, whose final report dated March 15, 1943, was made a part of this record. This report summarized by the Hon. George B. Stevenson, Chairman of the Commission, made this pertinent observation: "From actual experimental data acquired and from the collective thinking of competent mining engineers, we have concluded that flushing is the only practical approach to the solution of this problem. By flushing is meant the re-filling and packing of waste and other materials into the voids. Evidence appears to be conclusive that subsidence will not affect the surface if those voids are flushed which lay within a range of 300 feet below the surface."

As recently as June 19, 1959, a special report to Governor David L. Lawrence, in regard to surface subsidence at Forty-Fort, Pa., prepared by a committee of mine inspectors appointed by the Secretary of Mines, stated that, "It is our opinion that subsidences such as occurred . . . in Forty-Fort will continue at periodic intervals and that the only solution, to at least minimize subsidence, is a long-range flushing program." This is in reference to the entire built-up area where mining has taken place. In our case, the Turnpike Commission was only concerned about the area over which the turnpike was constructed. We have in effect created a built-up area by constructing a pavement designed for high speed passenger and heavy vehicle travel so that the burden of support placed on the substructure is comparable to any so-called built-up area in the region. The report further said, "Practically the entire built-up section of Wyoming Valley is undermined to a greater or lesser degree . . . eventually, subsidence will occur in practically all areas where mining has occurred."

The report referred to was submitted by Mine Inspectors Thomas M. Beaney, Andrew Wilson and Ken-

neth C. Lee, to the Honorable Joseph T. Kennedy, Secretary of Mines and Mineral Industries. Since the report was submitted to Governor Lawrence, it must be assumed that it was endorsed by the Secretary of Mines as the current official opinion of the Department of Mines, and further that such submission constituted an official approval of the contents.

This report is significant and tremendously important since Thomas M. Beaney was one of the material witnesses who testified for the Commonwealth in these cases. He testified that the work performed by Manu-Mine Research and Development Company in connection with drilling and flushing along the turnpike right-of-way through the Wyoming Valley was "for the most part, with the exception of two or three areas, unnecessary and particularly all of the work done over robbed-out and completely mined areas" was unnecessary. He further testified that this was unnecessary "because, after a mine has been robbed out or a section of a mine has been robbed out, it caves. The voids are filled and overburden comes to rest, and there is no need for anything additional which may help. Nothing else will certainly help it." The same opinion was expressed and amplified by Daniel H. Connelly, Deputy Secretary of Mines, Ralph A. Lambert, Chief Engineer, Department of Mines, James H. Pierce, President of Pierce Management and Frantz Edgar Kudlich, Associate of James H. Pierce.

These witnesses testified that 95% of the work performed was unnecessary because it occurred in robbed-out areas where mining had been completely performed; and that it has been their experience, gained through practical experience in removal of pillars, that after approximately seven (7) years, equilibrium is gained again. The report of June 9, 1959 flatly refutes these opinions for it assigns as one possibility of subsidence the robbing which occurred in 1934, 25 years before the

subsidence in Forty-Fort. If subsidence was possible in Forty-Fort after 25 years, then it is a reasonable conclusion that similar subsidences could occur under the turnpike right-of-way. So that the so-called "seven year rule" upon which the majority places reliance is theoretical, impractical rule of thumb without the benefit of scientific support.

This report clearly indicates that there is always a danger of subsidence regardless of the length of time that has elapsed after last mining or robbing. This risk could not be assumed by the Turnpike Commission because of its standard of "maximum safety." They recommended a long range flushing program as the remedy for preventing subsidence in built-up area. Since many of the areas inspected and included in this report were inaccessible for physical examination so that inspection could only be made by an examination and review of mine maps, it necessarily must follow that they would be inaccessible for flushing purposes except by the method recommended by Manu-Mine Research and Development Company, which has been referred to as "blind-flushing".

As a practical matter, I question the wisdom of the construction of a modern high speed turnpike over mined-out areas without using the maximum safety rule that will require flushing the voids under the area. Certainly when we contemplate the disaster that might follow the failure of surface support on such a highway, it seems to make imperative the adoption of the rule. An example that gives a vivid picture of the result of highway subsidence is defendants' Exhibit No. 62, pages 403 to 407, of Vol. XXI, of the record. A fine example of this condition is found on State Highway Route 122, between the Borough of Ashland, Schuylkill County and the Borough of Mount Carmel, in Northumberland County, where a four-lane divided highway, despite continuous repair, has been broken up

by mine subsidence so that permanent signs now appear on the highway warning motorists of a 25-mile speed limit because of mine subsidence. Such a situation certainly could not be tolerated on what Pennsylvania proudly calls the greatest all-weather highway in the world. So that the action of the Turnpike Commission in following the maximum safety rule, instead of being criminal, was in fact, the exercise of wise and prudent judgment.

As to the inception of the contract in question, the record, without contradiction, indicates that all negotiations leading to the contract were conducted between Manu-Mine officials and the engineers of the Commission. (All engineers of the Commission who were indicted were acquitted by the jury). The Assistant Chief Engineer of the Turnpike Commission (John D. Paul, an acquitted defendant) requested Manu-Mine to submit cost estimates and proposals. The preliminary draft of the contract and the cost analysis were all submitted to John D. Paul. There is absolutely no evidence that any of the Commissioners suggested or dictated any of its terms, or saw a proposed contract prior to its approval.

The contract was thoroughly discussed at the meeting of February 28, 1955, by the turnpike engineers and the consulting engineers who recommended its approval. There is nothing to indicate that Mr. Evans or Mr. Torrance knew any more or less than the other commissioners present. Except for the vague and uncertain testimony of Mr. Lawler, who testified that "they" took up the importance of the contract and "they" were faced with a deadline for completion; "they" were faced with paying interest and that "he" would say by "they" he meant Torrance, Evans and Mr. Paul.

Under the original Act creating the Pennsylvania Turnpike Commission and its various amendments and supplements, including the Act of 1951, creating the

Northeastern Extension of the Pennsylvania Turnpike, the Turnpike Commission was an autonomous body. Under the various statutes which created it, it was not required to submit to competitive bidding any contract, regardless of its nature or character. Neither was it required to comply and conform to the various rules and regulations and statutory requirements which pertain to the highway department or any other branch or bureau of the State government.

The contract in question was not submitted to competitive bid. This was due to the fact that the engineering staff of the Turnpike Commission as well as the consulting engineers, at the meeting of February 28, 1955, when the contract was discussed, recommended its approval in its then present form. The legal staff of the Turnpike Commission subsequently approved the contract both as to substance and as to form. Thus, no criminal motive could possibly be assigned to any of the members of the Turnpike Commission who voted approval of the contract, because it was not submitted to competitive bidding.

It was the practice of the Turnpike Commission to submit construction contracts to competitive bids. However, it was not an undeviating practice or custom, for the record shows that many contracts were let without competitive bids. One was for the construction of a bridge entailing an expenditure in the millions of dollars. Another was for slushing under the Northeastern extension, a contract which was let in 1955. Therefore, because this contract was not submitted to competitive bid does not and cannot place any criminal motive in the minds of any of the Turnpike Commissioners.

It was the custom of the Commission to submit to the Highway Department construction contracts for its approval. This was done through the offices of a liaison man, who at the time of this contract was Henry Klaus. However, engineering contracts were never

competitively bid and neither were they submitted for
approval to the Highway Department nor were they
ever approved by that body. Mr. Klaus, who was the
liaison man, when he saw the drilling work progressing
on the Northeastern extension questioned the Chief
Engineer, the Assistant Chief Engineer concerning this
and he was advised that the contract was engineering
in nature and did not require Highway Department ap-
proval.

However, the submission of construction contracts
to the Department of Highways for its approval was
also not an undeviating practice or custom, for the rec-
ord is replete with numerous contracts which were nei-
ther submitted nor approved by the Highway Depart-
ment, all of which were construction contracts. Re-
gardless of the nature of the contract, whether it be
engineering or construction, the fact is that the con-
tract was approved by the full body of the Commission
at a regular meeting on the recommendation of the
engineering staff and upon the approval of the legal
department and certainly these men were entitled to
rely upon the technical advice of the men they had en-
gaged to assist them. Certainly such conduct cannot
be criminal in nature.

This contract, it is argued by the majority, was dis-
guised as an engineering contract in order to avoid the
requirements as to bidding, competitive bidding, and
other features. Certainly no attempt was made to dis-
guise its nature since it was discussed completely by
the engineering staff at the meeting, and its character
and nature was known to all of the Commissioners and
not just to the two who were indicted and convicted.
It was the practice of the Commission to assign num-
bers to construction contracts, although engineering
contracts bore no numbers. The contract in question
was subsequently assigned a number by Mr. McNeill,

the Finance Director of the Commission. There is no testimony in the record to show that any of the Commissioners or any of the defendants, other than McNeill, knew of the assignment of a number or the reason one had been assigned to it. Regardless of what may have motivated Mr. McNeill in assigning a number to this contract, that does not in and of itself raise it or lower it to the status of a construction contract. There is evidence on the record that many engineering contracts were assigned numbers and treated as construction contracts and only for the purpose of facilitating payment to the contractors involved. There is also testimony on the record that many construction contracts were not assigned numbers. Therefore, this cannot be taken as a hard and fast rule and no criminal motive can be ascribed to any of the Commissioners or any of the defendants for having failed to assign a number to the contract or for having subsequently assigned one. Certainly nothing criminal in character can be inferred from such conduct.

Likewise, the contract failed initially to require performance bonds. At the instance of the Finance Director on June 30, 1955, performance bonds were furnished. It was the custom of the Commission to have construction contracts carry performance bonds. The fact that none was initially required in this particular instance was probably due to the recommendation of the consulting engineers and the engineering staff, that it was an engineering contract and no one in the Commission felt that such a bond was necessary. The fact that one was subsequently supplied is not to be taken as evidence of any criminal intent or motive on the part of anyone. It was willingly given by Manu-Mine for the purpose of protecting the Turnpike Commission and protecting the materialmen and those who were performing services for Manu-Mine under that contract. That, in itself, would not raise the nature of the

contract to be construction in nature rather than engineering.

The majority opinion devotes some time to the estimated drilling costs as submitted by Manu-Mine. The record, however, discloses that the estimated cost of drilling as submitted in May, 1955, at $2,500,000 was to cover only two sections of the Turnpike, viz.: 37-H and 37-I. The record also discloses that this estimate was prepared by the field engineering force and certified to by Mr. Guldin, an engineer for the Turnpike Commission. (Vol. 4, page 857R). This estimate was subsequently increased in September, 1955 to $6,600,000 on all sections of the Turnpike, 37-H to 37-L, inclusive, and in December of 1955, an increase to $8,500,000 total. These increases were likewise submitted by the field engineers and not by Manu-Mine. (Vol. 5, 1137R). If this is so, and the record is undeniable in this respect, then it cannot be said that any of these defendants engaged in a criminal act because the estimates were not submitted by either of them and neither is there any evidence that any of the defendants had anything to do with the preparation of the estimates as submitted by the field engineering force.

The majority opinion devotes considerable time in arguing that the price charged by Manu-Mine for the drilling under this contract was grossly exorbitant. It is true, that under the contract, Manu-Mine did make a large profit. However, the cost analysis submitted by it to the Commission was based upon actual performance of a JOY-32 drill which was used by Manu-Mine under its exploratory contract of July 7, 1954. Even the expert witnesses of the Commonwealth concede that the cost analysis submitted for the work performed under that contract and performed by the JOY-32 drill, were accurate and correct, as to drilling rate and as to the cost of drilling the holes. During the negotiations, leading to and culminating in the con-

tract of February 28, 1955, it was contemplated that a JOY-32 drill would be used for this work. However, Manu-Mine did succeed in securing the B-58 drill, also manufactured by the Joy Company. The use of these drills was contemplated about the middle of February, 1955, but there is nothing in the record to indicate that Manu-Mine indicated to the Turnpike Commission or its engineering staff that it intended to use a drill other than the JOY-32. There was no experience on this type of drilling with a B-58 drill prior to the performance of this particular contract. The uncontradicted testimony is that a B-58 drill was used in the anthracite area for drilling shallow holes in stripping excavations for the purpose of blasting the overburden. The average depth of such holes was forty (40) feet, although there were some instances of test holes having been drilled to one hundred and one hundred fifty feet. There was no experience as to holes having been drilled in excess of one hundred fifty feet, although many of the holes under the Northeast extension were drilled to three hundred and three hundred fifty feet. There was no experience with a B-58 drill as to the average that could be drilled per shift or per machine. Certainly, the record does not show that any of the defendants had such prior knowledge as to the performance of this drill. That it did perform well cannot be disputed. However, its performance should not and cannot be used for the purpose of ascribing a criminal motive to any of the defendants, since it was unknown at the time of the execution of the contract what the performance rate would be.

I concur with the majority in the discharge of the defendant Mr. McNeill. I concur wholeheartedly in the opinion of Judge WOODSIDE with regard to the defendant Mr. Torrance and feel that the opinion is equally applicable to Mr. Evans, another one of the defendants. In the case of Mr. Evans there is less evidence on the

record which would establish guilt or criminal motive or other connection with any wrongdoing in these actions than any of the other defendants. What Judge WOODSIDE has said concerning the testimony of Mr. Lawler is equally applicable to Mr. Evans.

The only other two matters in the testimony which could remotely connect Mr. Evans with either a conspiracy or misbehavior in office is his relationship by marriage to the defendant Stickler. It should be noted that this relationship is rather remote, since Mr. Stickler was the nephew of Mr. Evans' wife. It should also be noted that this relationship was known to everyone in the Turnpike Commission. Mr. Evans made no attempt to conceal it nor to hide it, and when the contract was being negotiated the engineering department and the legal department, as well as the Commissioners, excepting perhaps Mr. Lawler, knew of the relationship between them. The fact that Mr. Evans was Richard Evans' father can give rise to no criminal or corrupt motive on the part of the defendant. There is no testimony on the record that Mr. Evans, or any other defendant, knew of his son's stockholding interest in Manu-Mine. He was an emancipated son, who had his own home and was fifty years of age. It would be not an inference, but an assumption, for this Court, and the trial court, and the jury to say that Mr. Evans knew of his son's stockholding interest. We believe it would be highly conjectural to convict a defendant on testimony so weak as this.

The other incident referred to which might have some bearing on the guilt or innocence of Mr. Evans was the so-called Sterling Hotel incident. It arose on cross-examination of a defense witness, Mr. Luke, when he was asked by the Commonwealth's officers concerning a newspaper article to be read into evidence. It is clear that this testimony was hearsay. However, Luke denied and reiterated his denial on many occasions that

he did tell the reporter that Manu-Mine was to receive the contract. He stated that the newspaper reporter magnified his very few remarks and denied that he made the remarks attributed to him. Mr. Evans, according to Dr. Cleaves, stated to the doctor that he was to have taken care that Manu-Mine did not get into trouble like this. However, is that statement sufficient to raise the inference that Mr. Evans was engaged in a criminal conspiracy or that he was corruptly motivated in negotiating or entering into the contract so as to amount to a misbehavior in office? Can it give rise to a fact that the contract was a fraud? I think not.

It is of extreme importance to note that Mr. Evans left the Turnpike Commission on June 30, 1955 at which time the estimated drilling cost under Manu-Mine's contract on 37-H and 37-I was $2,500,000 and the estimated cost for slushing on those two sections was $2,000,000, a total of $4,500,000. The increased estimates for drilling and for slushing were made in September and December of 1955, long after Mr. Evans had left the Turnpike Commission. If the program increased in magnitude and if false representations were made after Mr. Evans left the Turnpike Commission, certainly he cannot be held responsible. From the time of the execution of the contract until Mr. Evans left the Commission there were but three payments made to Manu-Mine under this contract and he voted to approve all three payments. He was not a party to subsequent approval, which were made by the Turnpike Commissioners who succeeded him. It is significant in both the conspiracy and misbehavior indictments that fourteen different people approved every payment received by Manu-Mine. None of them have been charged with conspiracy or with misbehavior in office. These people include engineers, inspectors, attorneys, finance people, accountants, as well as the new chairman of the

Commission, who visited the scene of the work and the Secretary of Highways, who had a representative of his department assigned to the work.

The most amazing thing about those cases is that only Commissioners Mr. Evans and Mr. Torrance have been charged with wrongdoing. This, of course, must come from Governor Leader's statement that it was a Republican conspiracy and these two men are Republicans. The members of the Commission at the time of the contract were Evans, Torrance, McSorley, Lawler and Watson. The contract was approved on February 28, 1955 on motion of McSorley, seconded by Watson. Can this Court conclude that men of this type, all of whom had prior public service in the Commonwealth, who had received their appointments from the Governor of Pennsylvania and had their appointments confirmed by the Senate of Pennsylvania, would be pulled literally by their respective noses in approving a contract involving millions of dollars at the behest of Mr. Evans and Mr. Torrance. To me this is unbelievable.

On December 12, 1955, on recommendation of Mr. Pepper, of the Commission's legal department, another contract was approved by the Commission for the Manu-Mine Company. The motion for the approval of this contract was made by Mr. Lawler and seconded by Mr. Torrance and passed unanimously by the Commission. This contract was for additional work on the Northeast extension. It was declined by the Manu-Mine company because the company did not have sufficient personnel to do the additional work. At that time Mr. Evans was no longer a member of the Commission as his term expired June 30, 1955. Evidently at that time Mr. Torrance was carrying the so-called conspiracy, solo.

Mr. Lawler's answer, on cross-examination, pinpoints the answer to all the questions raised by the conspiracy indictment:

"Q. Do you mean to tell us that you voted for and did vote for the awarding of the contract and the doing of the work without knowing what was involved? A. I depended upon the legal counsel, I depended upon our engineering staff, I depended upon our consulting engineers. That is why the Turnpike has retained these people to advise and instruct us Commissioners."

The votes of Mr. Torrance and Mr. Evans were motivated by the same reasoning. It is inconceivable that Mr. Lawler, a former Assistant Postmaster General for the United States, Mr. Watson, a former County Commissioner of Philadelphia, and Mr. McSorley, a wealthy and successful business man from Pittsburgh, would be dupes to a conspiracy involving millions of dollars.

It is strange that all of these men never suspected any fraud or any wrongdoing. It is strange, too, that these same people in December of 1955, to which Mr. Evans was not a party, voted unanimously to give Manu-Mine another contract. Mr. Evans had nothing to do with any payments made to Manu-Mine after his term on the Commission had expired. There is no justification then, in assuming that Mr. Evans was criminally motivated or corrupt in entering into this contract because of the size and the magnitude of the payments made to Manu-Mine by other Commissioners, long after he was not a member. In retrospect, it may seem rather odd and strange that this work would continue and arise to such proportions, but certainly, looking at it prospectively, can anyone say that Mr. Evans or any member of the Turnpike Commission or any member of the engineering staff, or the accountants, or the lawyers, too, had any conception of what it eventually might lead to. I would arrest judgment and discharge the defendants, Mr. Torrance and Mr. Evans.

I would grant a new trial to all of the defendants because, in my opinion, the many trial errors that were committed amounted to a denial of a fair trial and the

violation of the due process clause of the United States and Pennsylvania Constitutions.

The first trial error is the joint trial of obviously repugnant indictments. The false pretense indictment was repugnant to both the conspiracy and misbehavior in office indictments. The conspiracy indictment charges a criminal confederation on the part of the nine-named individuals to cheat and defraud the Turnpike Commission by entering into the contract of February 28, 1955. The misbehavior cases charge Mr. Evans and Mr. Torrance with corruptly negotiating and executing the contract and corruptly permitting payments to be made thereunder to Manu-Mine. The false pretense indictment, on the other hand, charges Stickler and Landsidle with making false representations to the Turnpike Commission, thereby obtaining the Commission's approval and the signatures of Mr. Evans and Mr. Torrance as officers, with criminal intent to cheat and defraud the Turnpike Commission.

The fact that the Commission may have been defrauded as a result of the representations cannot alter the indisputable fact that the deception was practiced upon the Turnpike Commissioners, and their engineering and legal staffs. If Mr. Evans and Mr. Torrance were induced to execute the contract by virtue of false representations made to the engineering staff or to them, it negatives any participation by them in a criminal conspiracy and contradicts any corrupt or illegal motive as charged in the misbehavior indictments.

If the conditions preceding and succeeding the execution of the contract were falsely represented by Stickler and Landsidle, how can it be said Mr. Evans and Mr. Torrance or any of the Commission staff were corruptly motivated, much less engaged in a criminal conspiracy? Clearly, the one offense is repugnant to the other two and therefore the testimony submitted in

the false pretense case would not be material or relevant to the conspiracy and misbehavior indictments and did not show a general course of conduct all tending to the same general end. *Com. v. Dixon,* 179 Pa. Superior Ct. 1, 115 A. 2d 811 (1955) ; *Com. v. Novak,* 165 Pa. Superior Ct. 576, 69 A. 2d 186 (1949) ; *Com. v. McCord,* 116 Pa. Superior Ct. 480, 176 A. 834 (1935) ; *Com. v. Quinn,* 144 Pa. Superior Ct. 400, 19 A. 2d 526 (1941).

The proof in the false pretenses case would not support the allegations set forth in the other two indictments. As a result, much that was admitted generally without cautionary or limiting instructions by the trial court, and some was conditionally admitted, and some limited to some defendants and not to others, and some was admitted and made applicable to one or two indictments and restricted as to the others. One reading this record could not help but be confused by the limitations and restrictions placed thereon by the trial court. How then, can a lay jury, without the benefit of a written record, at the end of a lengthy and complicated trial, discriminate as to the various defendants and conflicting indictments and determine which testimony is applicable to each?

If a severance had been allowed, then much of the prejudicial testimony deemed admissible as to Stickler and Landsidle would not have been allowed. The fact that Manu-Mine had purchased a fur coat for the wife of Stickler, that it had paid for a house and for furnishing the same for Mr. Stickler, and for a trip to Honolulu for Stickler and his family, was not material to any of the charges other than possibly the false pretense case. It has no bearing upon either the conspiracy or misbehavior charges, although admitted as applicable to the former. Its prejudicial effect on the jury, of course, cannot be measured but its intended effect was obvious—to create an atmosphere of nefarious activities on the part of one defendant which could have

no evidentiary value as to the conspiracy or misbehavior charges.

In my opinion, the consolidation of these obviously repugnant indictments was prejudicial and constitutes reversible error.

Another glaring error, prejudicial in nature, admitted over defense objections, was the testimony of the chief counsel for the Pennsylvania Department of Highways, who read to the jury the applicable statute setting forth the required procedure pertaining to the Highway Department in advertising and awarding contracts for highway construction. When the testimony was offered the trial judge admitted it conditionally and not until all the evidence was offered was a ruling on its admissibility finally made. (The Turnpike Commission was specifically exempt from the procedural requirements of the Act of 1945, P. L. 1242, Sec. 103, 36 PS 670-103). The submission of this testimony to the jury was tantamount to telling the jury that the Turnpike Commission was governed by the same legal and procedural requirements in awarding contracts as controlled the Highway Department.

What purpose could the testimony serve? Did it aid in any way to prove any of the charges in any of the indictments? Where is its evidentiary value? This error was not innocuous and harmless as the majority opinion holds. It was substantial and prejudicial. Its purpose was to convey to the lay jury the implication that the Turnpike Commission was bound by the same law as the Highway Department. The trial court was in doubt as to its admissibility for it reserved its ruling until the very end of the trial. The testimony should have been immediately rejected. The trial court compounded its original error in refusing to charge as requested by the defendant that the Turnpike was not statutorily obliged to let any contract, regardless of its

nature, only after competitive bidding. It was, therefore, only natural for a jury to conclude that the procedural requirements applicable to the Highway Department were applicable also to the Turnpike Commission. This was prejudicial error.

Another manifest prejudicial error was the reception of rebuttal testimony offered by the Commonwealth at the close of the defendants' case. Five former inspectors of Manu-Mine were permitted to testify, over objection, that they were engaged in a separate conspiracy with officials of Rogers Construction Company, a prime contractor with the Turnpike Commission, whereby the witnesses gave false weight slips to Rogers' employees for slushing material never received. Each of them stated that knowledge of this scheme was not communicated to the officials of Manu-Mine or any of the defendants. In fact, as a result of a private investigation conducted at the instance of Manu-Mine each of the witnesses denied, under oath, that they were engaged in any fraudulent scheme. Under the guise of attacking the credibility of the defendant Stickler and defense witness Luke, who stated that they knew of no wrongdoing or irregularities in the slushing program. The testimony was admitted. If the testimony was germane to any of the offenses being tried it was admissible only to attack the credibility of a witness and not to establish the fact of other collateral wrongs. The statement to be rebutted was the knowledge or lack of knowledge of Stickler and Luke as to the irregularities, and not the existence or nonexistence of the irregularities. Since each of the rebuttal witnesses admitted that the defendants were ignorant of the fraud, the testimony should have been excluded.

The prejudicial effect of this testimony is apparent because it related to an independent series of crimes, not germane to the cases on trial: *Com. v. Saulsbury,* 152 Pa. 554, 25 A. 610 (1893) ; *Shaffner v. The Com-*

*monwealth*, 72 Pa. 60 (1872). It was error to admit as substantive evidence of an existing conspiracy, separate and distinct acts and declarations of persons, not defendants, or shown in any way to have been connected with them, not made in their presence without the knowledge of any of them. *Wyatt v. U. S.*, 23 F. 2d 791; *Com. v. Duffy*, 49 Pa. Superior Ct. 344 (1912); *Com. v. Lynch*, 49 Pa. Superior Ct. 370 (1912). One of our most fundamental and prize principles in the administration of criminal law is that a distinct crime, except under special circumstances, cannot be given in evidence against the defendant tried for another crime because the person who has committed one offense is not proof of another. Its effect is to create prejudice in the minds of the jury.

The rebuttal testimony was not germane to any of the issues on trial and raised a collateral ladder to the incalculable prejudice of the defendants. *Com. v. Petrillo*, 341 Pa. 209, 19 A. 2d 288 (1941); *Com. v. Burdell*, 380 Pa. 43, 110 A. 2d 193 (1955). In my opinion the admission of this highly prejudicial testimony into the record was a denial of due process and prevented, along with the other trial errors, the defendants from receiving a fair trial.[2]

_____

[2] As recently as April 16, 1959, this Court in *Com. v. Steinberg*, 189 Pa. Superior Ct. 381, at page 385, in an opinion by Judge HIRT, said: "A defendant on trial for crime, however guilty, may insist that the Commonwealth establish his guilt, by competent evidence in strict compliance with the law, unaffected by implication or innuendo flowing from collateral matters. . . . But when the court, over objection, permitted the Commonwealth in rebuttal to develop testimony on matters foreign to the issue trying, for the purpose of contradicting defendant Steinberg on an issue of his credibility, he clearly was prejudiced and the admission of this testimony over the appellant's objection was reversible error. A witness may be contradicted only on matters germane to the issue trying. Commonwealth v. Kettering, 180 Pa. Superior Ct. 247, 252, 119 A. 2d 580; Commonwealth v. Graham, 170 Pa. Superior Ct. 343, 347, 85

The most glaring prejudicial error was the admission into evidence of the Grand Jury testimony of John D. Paul, former Assistant Chief Engineer of the Turnpike Commission and an acquitted defendant. It was admitted on the theory that it was a confession or an admission against the declarant. If the statement served that purpose, our review of the record fails to disclose any paragraph remotely resembling an admission of guilt on his part. It was rather an accusatory declaration, particularly against Mr. Evans, containing hearsay, conjecture and clear misstatement of facts. Had the Commonwealth attempted to offer the same testimony by other witnesses, most of it would have had to be excluded for failing to meet the standards of admissibility. However, under the confession theory, the Commonwealth accomplished by indirection what it could not have hoped to do directly.

If we permit the majority opinion in this respect to become the law in this State, then the Commonwealth can conduct criminal trials by ex parte proceedings or on depositions of witnesses without opportunity on the part of the accused to cross-examine. It is a clear vio-

---

A. 2d 632; Commonwealth v. Petrillo, 341 Pa. 209, 225, 226, 19 A. 2d 288."

This is exactly the situation that exists in the instant case where testimony concerning an independent series of crimes not germane to the cases on trial was admitted for the alleged purpose of attacking the credibility of the defendants. In an even more recent case decided by this Court on July 3, 1959, *Com. v. Towber*, 190 Pa. Superior Ct. 93, in an opinion, also written by Judge HIRT, the *Steinberg* case was cited with approval and it was again held that a defendant cannot be contradicted by showing particular instances of misconduct disconnected with and collateral to the issue being tried. And in this case, at page 99, Judge HIRT said: "Nor was the admission of such evidence justified on the theory stated in the opinion of the lower court that: '. . . the truth of this matter was not in issue but only whether the defendant had made the same.' "

lation of constitutional rights. The cases relied on in the majority opinion to substantiate its opinion are easily distinguished from the situation confronting us. In all of those cases there was *direct* testimony of the conspiracy or of the crime involved. In *Com. v. Berman,* 119 Pa. Superior Ct. 315, 181 A. 244 (1935), one of the codefendants testified as a Commonwealth witness and implicated all of the defendants, including Berman (appellant) as well as Cummings, whose prior declarations were read as against him. There was other testimony supporting the conviction of Berman if Cummings' statement were entirely excluded. That is not the picture we have before us. Without the Grand Jury testimony of John D. Paul, the convictions cannot stand against any of the defendants, for the record does not establish the guilt of any of them beyond a reasonable doubt.

We do not believe that the cautionary instructions of the trial court limiting the Grand Jury testimony to John D. Paul to the declarant alone is sufficient to remove the obviously prejudicial character of his testimony. As we have previously stated, much of it contained hearsay, conjecture and plain misstatements of fact. It is full of leading questions asked by the Commonwealth amounting to actual testimony by the District Attorney and the Attorney General. In my opinion the statement should have been scanned and all hearsay, conjecture and misstatements have been eliminated, either by the Commonwealth or by the trial court when it became evident that it did not contain a confession or an admission.

Such has been the practice in many counties throughout the Commonwealth when a confession or admission against interest is offered on the part of one defendant. The names of other codefendants and material therein, which is applicable not to the defendant doing the confessing but only to others, has been elimi-

nated by the Commonwealth before submitting it to the jury. In some instances the court itself has stricken out the irrelevant and possibly prejudicial portions. See *Com. v. Epps,* 298 Pa. 377, 148 A. 523 (1930); *Fife, Jones & Stewart v. The Commonwealth,* 29 Pa. 429 (1857). In *Com. v. Novak,* supra; *Com. v. Fugmann,* 330 Pa. 4, 198 A. 99 (1938), and in *United States v. O'Malley,* 117 F. Supp. 895, the respective Courts refused to admit testimony of this character. The latter case is of particular importance for the facts very nearly parallel the instant case. In that case the Circuit Court granted a new trial because of the obvious prejudicial character of the statement of one of the defendants which was permitted to be read into evidence and which the Court limited by striking out portions thereof as being not applicable to the defendant who was convicted. It is a naive theory that prejudicial effects can be overcome by cautionary and sterilizing instructions to a jury. All practicing lawyers know this to be a fiction.

It is significant that despite the trial judge's instructions limiting this testimony to the declarant alone, that he still used portions of the Paul testimony in his charge to the jury against the other defendants. It is also significant to note that the lower court devotes considerable time in its opinion to the Paul testimony in order to substantiate the conviction of these defendants. It used John D. Paul's testimony to prove a conspiracy and to uphold the verdict, and this Court, in its majority opinion, is doing exactly the same thing. The obvious reason is because without this testimony there remains no set of circumstances from which a reasonable inference of guilt can arise. In the interest of justice it is my opinion that we should categorically state and condemn such a practice by the Commonwealth, and not to permit testimony of this character to be introduced into evidence.

It is significant to note, too, that John D. Paul, the confessor, had more to do with the negotiation and the effectuation of the contract than any of the other defendants, and it is a strange coincidence that he should have been acquitted and those who the record discloses had little to do with either the negotiation or putting into effect the contract should have been convicted.

To summarize, in my opinion, I would discharge all the defendants because of the invalidity of the indictments; failing this, I would reverse the judgments of sentence and discharge Mr. McNeill, Mr. Evans and Mr. Torrance because of insufficiency of the evidence and award a new trial to Mr. Landsidle and Mr. Stickler; failing this, I would grant a new trial to all of the defendants on the ground that any one of the trial errors, discussed in this opinion, is sufficient to prejudice the constitutional rights of these defendants and prevent a fair trial, but that certainly the multitude of trial errors contained in this record taken cumulatively, together with the trial atmosphere, constitute a situation which amounts to a denial of due process and where the ends of justice demand a new trial.